STEPHEN LINDSEY AND OTHERS, PLAINTIFFS IN ERROR v.
THE LESSEE OF THOMAS B. MILLER, DEFENDANT IN
ERROR.

*Ejectment.* The plaintiff claimed the land in controversy, which was situated
in the Virginia military district, in the state of Ohio, under a patent from the
United States, dated 1 December 1824, founded on an entry and survey exe-
cuted in the same year. The defendants offered in evidence a patent, issued
by the state of Virginia in March 1789, to Richard C. Anderson, for the same
land, which was rejected by the court; and they gave in evidence, an entry and
survey of the land made in January 1783, recorded on the 7th of April in the
same year, and proved possession for upwards of thirty years. The warrant
under which the defendants' survey was made, stated that the services for.
which it issued were performed in the *Virginia state line; and not on the
continental establishment.* On the 1st of March 1786, Virginia conveyed to
the United States the territory north west of the river Ohio, with the reserva-
tion of such a portion of the territory, ceded between the rivers Sciota and
Little Miami, as might be required to make up deficiencies of land on the
south side of the Ohio, called the Green River lands, reserved for the Virginia
troops on *continental establishment.* The holders of Virginia warrants had
no right to locate them in the reservation, until the good land on the south
side of the Ohio was exhausted, and it was deemed necessary that Virginia
should give notice to the general government, when the Green River lands
were exhausted; which would give a right to the holders of warrants to locate
them in the district north of the Ohio. Lands could be entered in this district
only by virtue of warrants issued by Virginia to persons who had served three
years in the *Virginia line on the continental establishment.*

In May 1800, congress authorised patents to issue on surveys made under Vir-
ginia warrants issued for services on the continental establishment: warrants
issued by Virginia for services in her state line, gave no right to the holder to
make an entry in the reserved district.

The land in the possession of the defendant was surveyed under a warrant which
did not authorise the entry of lands in the reserved district. The possession
of the same did not bar the plaintiff's action.

It is a well settled principle, that the statute of limitations does not run against a
state. If a contrary rule were recognised, it would only be necessary for in-
truders on the public lands to maintain their possessions until the statute of
limitations shall run, and they then would become invested with the title
against the government, and all persons claiming under it.

The entry and survey of the defendant were made before the deed of cession—
at the time the location was made, the land in the reserved district was not
liable to be appropriated in satisfaction of warrants granted by the state of
Virginia for military services in the state line.

No act of congress was passed subsequent to the deed of cession, which enlarged
the rights of Virginia to the lands in the military contract beyond the terms of
the cession. Longer time has repeatedly been given for locations, but no new
rights have been created. It would seem, therefore, to follow that when the

act of 1807 was passed for the protection of surveys, congress could have designed to protect such surveys only as had been made in good faith; they could not have intended to sanction surveys made without the shadow of authority, or, what is the same thing, under a void authority.

It is essential to the validity of an entry that it shall call for an object notorious at the time, and that the other calls shall have precision. A survey, unless carried into grant, cannot aid a defective entry against one made subsequently. The survey, to be good, must have been made in pursuance of the entry.

To cure defects in entries and surveys, was the design of the act of 1807. It was intended to sanction irregularities which had occurred without fraud, in the pursuit of a valid title. In the passage of this act, congress could have had no reference but to such titles as were embraced in the deed of cession.

ERROR to the circuit court of the United States for the district of Ohio.

This was an ejectment in the circuit court of Ohio, instituted by the defendants in error for the recovery of a tract of land situated in the Virginia military district in the state of Ohio. The title of the plaintiff's lessor was derived from a patent issued by the United States, dated the 1st day of December 1824, for the premises in controversy; of which the defendants were in possession.

On the trial, the defendants offered in evidence the copy of a survey, bearing date the 5th of January 1788, recorded on the 7th of April in the same year. The entry and survey, which comprehended the land in dispute, were in the name of Richard C. Anderson, and the latter purported to be made for four hundred and fifty-four acres of land, part of a military warrant, No. 2481, on the Ohio river, on the north-west side, &c.

The defendants then read in evidence the act of congress of the 3d of March 1807, authorizing patents for land located and surveyed by certain Virginia revolution warrants, and the act, amending the same, passed in March 1823. They also offered in evidence the deposition of James Taylor, to prove that the defendants had been in possession of the premises for upwards of thirty years, which deposition was admitted by the court.

The plaintiff then offered evidence to prove that the warrant, on which the defendants' survey was predicated, was issued by the state of Virginia on the 12th of February in the year 1784, *for services performed in the Virginia state line,*

and not in the continental establishment.   The defendants objected to this evidence, but the court overruled the objection, and permitted the same to go to the jury.   The defendants, by their counsel, then moved the court to instruct the jury that, if they believed that the survey under which the defendants claim was founded on the warrant so admitted in evidence by the court, it did not render the survey void; but that the survey and possession, under the acts of congress referred to, constituted a sufficient title to protect the defendants in their possession.   The court refused to give the instruction, and directed the jury, that, if they believed the survey of the defendants was founded on the warrant offered in evidence by the plaintiff, then that the survey was void; and that the survey and entry, together with the possession of the defendants, were no legal bar, under the acts of congress aforesaid, to the plaintiff's right of recovery.  They further requested the court to instruct the jury, that, if they believed the defendants had the uninterrupted possession of the premises for more than twenty-one years since the commencement of the act of limitations in the state of Ohio, and before the commencement of this suit, that then the defendants had a title by possession; unless the plaintiffs came within some one of the exceptions of the statute.   The court refused to give such instructions.

They further requested the court to instruct the jury, that, if they believed the defendants were innocent purchasers without notice of the warrant offered in evidence by the plaintiff, that the defendants were entitled to a verdict.   The court refused to give such instructions.

To these proceedings of the court the defendants excepted; and a verdict and judgment having been rendered for the plaintiff, they prosecuted this writ of error.

The case was argued by Mr Ewing and Mr Corwin, for the plaintiffs in error; and by Mr Leonard and Mr Doddridge, for the defendant.

The only question argued before the court was that which had reference to the validity of the title derived by the plaintiffs in error, the defendants below, under the entry and survey in the name of Richard C. Anderson.   The counsel for the plaintiffs in error abandoned the point made in the circuit

court, that they were entitled to the benefits of the statute of limitations.

For the plaintiffs in error it was argued, that the plaintiffs' title was protected by the act of congress of March 3, 1807. That act was made to protect possessions against entries under certain descriptions of warrants; to prevent an entry or location on tracts for which patents had issued, or surveys had been made. It was admitted that there must have been a survey by some person, acting in an official capacity. The party claiming must show a colour of title; and that has been shown by the entry and survey in this case. There is no distinction under the law between surveys which were void and voidable. These terms are of very indefinite import, and the application of the act cannot turn upon them.

The cases of Anderson's lessee v. Clarke, 1 Peters, 636, and of Hoofnagle v. Anderson, 7 Wheat. 212, sustain the principles claimed by the plaintiffs in error. When in 1807 congress passed the law, they must be presumed to have legislated on the then existing state of things. It was then well known that there were lands held under claims drawn under surveys made for services in the Virginia state line. It must be presumed the act was intended to apply to those cases. The equities of both classes of claimants were the same; both were meritorious; and the powers of congress extended to both. In 1823, congress passed a law in precise accordance with the act of 1807, after the decision of the court in Hoofnagle v. Anderson, in 1822, relating to Virginia state warrants. There is nothing appearing on the face of the survey, under which the plaintiffs in error held the land, showing that their title below was derived under a warrant for services in the state line: nor is it open to inquiry whether the surveyor was legally authorized to make the survey.

The plaintiffs in error held as bona fide purchasers under Anderson's title: they are purchasers without notice.

The case of Miller and others v. Kerr and others, 7 Wheat. 1, and the cases cited for the defendant in error have no application to this case. The law of 1807 was not in the view of the court in the decision of these cases.

The limitation upon claims intended to be brought within

the act of 1807, extends in terms to such a warrant as the plaintiffs'. The meaning of the terms "patent" and "survey," is decided in the case of Hoofnagle v. Anderson; and in that case, the survey was under a state line warrant.

Mr Leonard and Mr Doddridge, for the defendant in error, contended that the act of congress upon which the plaintiffs rely, was intended to protect informal or imperfect entries or surveys under continental warrants, and not such as were absolutely void; such as surveys made under state line warrants. The surveys made on the ground, were to be protected when made under proper warrants.

This construction is established in the cases reported in Hard. Reports, 348, 358, 359.

In Miller and others v. Kerr and others, 7 Wheat. 1, this court decided, that as there was no reservation whatever of these lands in favour of the bounties due to the state line, no title could be acquired in virtue of such service. They add, the same principle was asserted by the court in the case of Polk's lessee v. Wendall; and we think it too clear to be controverted. The question upon which the court felt difficulty in Miller's case, was the admission of evidence questioning the validity of the warrant, which expressly recited, that the land was "due in consideration of services for three years as a lieutenant of the Virginia continental line." They determined in favour of admitting this evidence, because they say, "until the consummation of the title by grant, the persons who acquire an equity, hold a right subject to examination. The validity of every document is then open to examination, whatever the law may be after the emanation of a patent."

The force of this decision, as applicable to this case, is in no respect impugned by the case of Hoofnagle v. Anderson, susequently decided, and reported in 7 Wheat. 212. In this latter case the party was protected by his patent, which was issued before the making of his adversary's entry. In Miller's case, the party claiming under a warrant, in the state line, did not hold an operative patent. He held the elder entry and survey. The other party, having the senior patent, held the legal title. Consequently the party stood upon his entry and survey, which was open to examination. In this

case, the plaintiffs in error, having no legal grant, stand also upon their entry and survey: and upon the doctrine of Miller's case, these confer no title whatever.

In the Lessee of Anderson v. Clarke and Ellison, 1 Peters, 628, it was considered what description of survey protected land from entry under the law of March 2, 1807. The question presented in that case was, whether an entry and survey upon a warrant previously satisfied, was protected. The general principle was not decided; the court being of opinion that the particular circumstances and relations of the parties connected with the entries operated to protect them.

No doctrine is better settled than that a survey without an entry is void; none, than that an entry without a warrant to authorise it, is void. If the act of March 2, 1807, can be made to protect this survey, it protects that which before the passage of the law, was *absolutely void*—as much so as an entry made without reference to any warrant. The object of the law was to protect bona fide entries and surveys, made upon warrants capable of appropriating the land, but defective in some of the requisites specified in the law. This was a prudent and parental object. But it ought never to be construed as protecting that which originated in positive wrong, and unauthorised encroachment upon the rights of others.

Whatever might have been the original rights and equities of the two classes of claimants, and however true it may be, as suggested by the chief justice, in Hoofnagle v. Anderson, "that the rights of the state officers were not sufficiently respected when the legislature omitted to insert them, as well as their brethren of the continental line, in the reservation for military warrants;" it is certain that that omission limited and concluded their rights. An entry specifying that it was made upon a warrant in the state line, and a survey and patent containing the same specification, would be mere nullities; because all were contrary to law, and unauthorised upon the face of them. It is only where prima facie every thing is legal, that the grant appropriates the land: until the grant issues to shut up all inquiry into intermediate proceedings, the validity of both entry and survey depends upon the warrant. If that confer no authority, the entry and survey originate no right. Surely the act of March 2, 1807, was intended to protect

existing rights, and not to be made the foundation of new ones. Yet such must be its operation if it protect the survey in question.

Cited also, Swann's Collection of Ohio Land Laws, 121; 5 Cranch, 234; 7 Wheat. 212; 9 Wheat. 480.

Mr Justice M'LEAN delivered the opinion of the Court.

This is a writ of error brought to reverse a judgment of the circuit court, for the district of Ohio. The plaintiff in the court below prosecuted an action of ejectment to recover possession of four hundred and fifty and a half acres of land, lying in what is called the Virginia military district, and known by entry numbered twelve thousand four hundred and ninety-five.

Stephen Lindsey and others were made defendants; and were proved to be in possession of the lard in controversy

On the trial, the plaintiff exhibited a patent for the land, bearing date the 1st December 1824, which was founded on an entry and survey executed in the same year.

The defendants offered in evidence a patent issued by the commonwealth of Virginia, in March 1789, to Richard C. Anderson, for the same land, which was rejected by the court. They then gave in evidence an entry and survey of the land, made in January 1783, which were duly recorded on the 7th of April in the same year; and proved possession for upwards of thirty years.

The plaintiff then offered in evidence the warrant on which the entry and survey of the defendants were made; accompanied by proof, that the military services for which said warrant issued, were performed in the Virginia state line, and not on the continental establishment. This fact was apparent on the face of the warrant. To the admission of this evidence the defendants objected.

The defendants then requested the court to instruct the jury, that the uninterrupted possession for more than twenty-one years, was a bar to the plaintiff's recovery. That this possession, under the entry and survey before stated, ought to protect them against the title of the plaintiff. The court refused to give the instructions; on which ground, and because the court admitted the evidence offered by the plaintiff, which

[Lindsey and others v. The Lessee of Miller.]

was objected to by the defendants, a bill of exceptions was taken; which presents to this court the above questions.

That the possession of the defendants does not bar the plaintiff's action, is a point too clear to admit of much controversy. It is a well settled principle, that the statute of limitations does not run against a state. If a contrary rule were sanctioned, it would only be necessary for intruders upon the public lands, to maintain their possessions, until the statute of limitations shall run; and then they would become invested with the title against the government, and all persons claiming under it. In this way the public domain would soon be appropriated by adventurers. Indeed it would be utterly impracticable, by the use of any power within the reach of the government, to prevent this result. It is only necessary, therefore, to state the case, in order to show the wisdom and propriety of the rule that the statute never operates against the government.

The title under which the plaintiff in the ejectment claimed, emanated from the government in 1824. Until this time, there was no title adverse to the claim of the defendants. There can, therefore, be no bar to the plaintiff's action.

To understand the objection to the validity of the defendants' title, under their entry, survey and patent, it will be necessary to advert to the conditions on which the district of country, within which the location was made, was ceded by Virginia to the United States.

By her deed of cession, which was executed in behalf of the commonwealth by her delegates in congress in 1784, Virginia conveyed to the United States the territory north west of the river Ohio, with certain reservations and conditions, among which was the following: "that in case the quantity of good land on the south east side of the Ohio, upon the waters of the Cumberland river, and between the Green river and Tennessee river, which have been reserved by law for the Virginia troops on continental establishment, should, from the North Carolina line bearing in further upon the Cumberland lands than was expected, prove insufficient for their legal bounties; the deficiency should be made up to the said troops in good lands, to be laid off between the rivers Sciota and Little Miami, on the north west side of the river Ohio; in such

proportions as have been engaged to them by the laws of Virginia."

From this condition it is clear, that until the good land was exhausted in the district of country named, the holders of Virginia warrants had no right to locate them in the above reservation. This is the construction given by congress to the deed of cession, as appears from a resolution adopted by them on the subject. It was also deemed necessary, that Virginia should give notice to the general government, when the Green river lands were exhausted, which would give a right to the holders of warrants to locate them in the district north of the Ohio.

Lands could be entered in this district only by virtue of warrants issued by Virginia, to persons who had served three years in the Virginia line, on the continental establishment.

In May 1800, by an act of congress, the proper officer was authorised to "issue patents on surveys which have been, or may be made within the territory reserved by the state of Virginia, north-west of the river Ohio, and being part of her cession to congress, on warrants for military services issued in pursuance of any resolution of the legislature of that state, previous to the passing of that act, in favour of persons who had served in the Virginia line on the continental establishment."

Several laws were subsequently passed in relation to this reservation, and to the rights of warrant holders; in all of which, a reference is made to warrants issued for services performed on the continental establishment. This was in conformity to the deed of cession; and, although not necessary, was deemed proper, in giving time, to locate warrants in this district, in order to prevent the semblance of right from being acquired by virtue of locations made on other warrants.

It was known that Virginia had issued other military warrants for services in her state line, which gave no right to the holder to make an entry in the above district.

In the act of the 2d of March 1807, to extend the time for locating military warrants in the reserved district, and for other purposes, it is provided, "that no locations within the above mentioned tract, shall, after the passing of that act, be made on tracts of land for which patents had been previously

issued, or which had been previously surveyed; and any patent obtained contrary to the provisions of that act, was declared to be null and void."

As by the deed of cession the fee to this district passed to the United States, the patents for lands entered and surveyed within it, necessarily emanated from the general government. It is therefore clear, that the circuit court did not err in rejecting, as evidence, the patent which was issued by Virginia. for this land several years subsequent to the deed of cession. But the defendants below rely upon their survey, as being protected by the act of 1807. This is the main point in the case, and it becomes necessary fully to consider it.

The entry and survey of the defendants were made before the deed of cession, but it is not contended, that, at the time this location was made, the land within this district, under the laws of Virginia, was liable to be appropriated in satisfaction of warrants granted by the state for military services in the state line. The fact, therefore, of this location having been made, while the fee of this district remained in Virginia, cannot give it validity, as the entry was not made in pursuance of the laws of Virginia.

By the act of 1807, any patent is declared to be void that shall be issued on an entry of land which had been previously patented or surveyed. This language is general, and literally applies to all surveys which had been previously made, whether made with or without authority. Could congress have designed by this act to protect surveys which had been made without the semblance of authority. If an intruder, without a warrant, had marked boundaries in a survey, either large or small, would it be protected under the act. When the object and scope of the act are considered, and other laws which have been enacted on the same subject, and the deed of cession are referred to; it would seem that much difficulty cannot be felt in giving a correct construction to this provision.

In making the cession, Virginia only reserved the right of satisfying warrants issued for military services in the state line, on the continental establishment. Warrants of no other description, therefore, could give any right to the holder, to any land in this district. In all the acts subsequently passed, giving further time for the location of warrants in this reservation,

there is a reference to the kind of warrants which may be located. And in the act of 1807, the "officers and soldiers of the Virginia line on continental establishment, are named as entitled to land in the district."

No act of congress passed subsequent to the deed of cession, which enlarged the rights of Virginia to this district, beyond the terms of the cession. Longer time has repeatedly been given for locations, but no new rights have been created. It would seem, therefore, to follow, that when the act of 1807 was passed for the protection of surveys, congress could have designed to protect such surveys only as had been made in good faith. They could not have intended to sanction surveys made without the shadow of authority, or which is the same thing, under a void authority.

It is known to all who are conversant with land titles in this district, that the mode pursued in making entries and surveys under the Virginia land law, gave rise to the most ruinous litigations. The docket of this court contains abundant evidence of this fact. By the law of 1807, congress intended to lessen litigation.

It is essential to the validity of an entry, that it shall call for an object notorious at the time, and that the other calls shall have precision. A survey, unless carried into grant, cannot aid a defective entry against one made subsequently. The survey, to be good, must be made in pursuance to the entry.

To cure defects in entries and surveys was the design of the act of 1807. It was intended to sanction irregularities, which had occurred without fraud, in the pursuit of a valid title. In the passage of this act, congress could have had no reference, but to such titles as were embraced by the deed of cession.

The case of Miller and others v. Kerr and others, reported in 7 Wheaton, 1, is cited by the defendants' counsel. In this case the register of the land office of Virginia, had, by mistake, given a warrant for military services in the continental line, on a certificate authorising a warrant for services in the state line. An equity acquired under this warrant was set up against a legal title subsequently obtained; but the court sustained the legal title. They considered the gister a ministerial officer; and that his official acts, as such, might be in-

quired into.   This entry was made subsequent to the deed of cession, and the court seemed to think if this territory had not been ceded, there would have been great force in the argument, that as the holder was entitled to the land for services rendered, and as, by the mistake of the officer, he had been prevented from locating the warrant in Kentucky, and as no provision existed by which his claim could be satisfied; if the entry made should not be sustained, that under such circumstances it should be held valid.   The case was a hard one, but the court were clear, that by virtue of the warrant thus issued no right could be acquired in the Virginia reservation.

The case of Hoofnagle and others v. Anderson, 7 Wheat. 212, is strongly relied on as a case, if not directly in point, that has at least a strong bearing on the question under consideration.   In that case the court decided, that a patent is a title from its date, and conclusive against all those whose rights did not commence previous to its emanation.   The entry on which this patent was founded was made in the Virginia reservation, by virtue of a warrant which was in fact issued for services in the state line; but it was stated on its face to have been issued for services on the continental establishment.

This case would have been similar to the one under consideration, if the patent had not been issued; but the decision turned against the subsequent locator, on the ground that the patent appropriated the land.

The court say, that the "principle is well settled, that a patent is unassailable by any title commenced after its emanation."   The case of Jackson v. Clark et al. 1 Peters, 628, it is contended, bears a close analogy to the one under examination.   That was a case where the act of 1807 was decided to protect a survey, although made on a warrant which had been previously located and not withdrawn.   But the court sustained the survey, on the ground that it was not a void act, though it might be irregular.   That to the purchaser of the survey, there was no notice of irregularity, much less of fraud.

The warrant was valid, and upon its face authorised the entry.   The entry had been regularly made on the books of the surveyor, and the survey had been executed by a regular officer; and the only objection to the validity of the proceedings was, that the warrant had been previously located.   This

location, the court said, might be withdrawn, and that would remove all objections to the subsequent proceedings. And they intimate that the powers of a court of chancery were sufficient to have compelled the original locator to withdraw the first entry, or enjoin him from the use of it, so as to remove the objections to the second entry. Under all the circumstances of the case, they consider that the second survey was protected from subsequent entries by the act of 1807.

They say, "if it be conceded that this provision in the above act was not intended for the protection of surveys which were in themselves absolutely void, it must be admitted that it was intended to protect those which were defective, and which might be avoided for irregularity."

There can be no doubt that congress did intend to protect surveys which had been irregularly made, and it is equally clear that they did not design to sanction void surveys. A survey is void, unless made under the authority of a warrant; and it need not be stated again, that the warrant under which the survey of the defendants in the circuit court was made, gave no right to the holder to appropriate land north of the Ohio.

Neither the entry nor the survey is a legal appropriation of the land. The claimant is only vested with the equitable estate, until his entry and survey have been carried into grant.

This court decided, in the case of Taylor's Lessee v. Myers, 7 Wheat. that the act of 1807 did not protect a survey from which the entry had been withdrawn.

In the argument, it was insisted that the entry and survey having been made in the name of Richard C. Anderson, the principal surveyor, were void under the laws of Virginia: that by those laws he was prohibited from making an entry in his own name.

As there are other points in the cause on which the decision may rest, it is unnecessary to investigate this one farther than to observe, that, under other circumstances, it might be entitled to serious consideration.

This is a case of great hardship on the part of the defendants below; and regret is felt that the principles of law which are involved in the cause do not authorise a reversal of the judgment given by the circuit court.

[Lindsey and others v. The Lessee of Miller.]

The judgment must be affirmed with costs, and the cause remanded for further proceedings.

Mr Justice BALDWIN dissented, and gave an opinion in writing; which was not delivered to the reporter.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Ohio, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this Court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed with costs, and that this cause be and the same is hereby remanded to the said circuit court for further proceedings to be had therein according to law and justice, and in conformity to the judgment of this court.