44 U.S. 32 (1845)
3 How. 32
JAMES BARRY, PLAINTIFF IN ERROR,
v.
HAMILTON R. GAMBLE.
Supreme Court of United States.

*36 The cause was submitted upon printed arguments, by Lawless for the plaintiff in error, and Spaulding for the defendant in error.
*51 Mr. Justice CATRON delivered the opinion of the court.
The first question in order is, whether the patent to Lafleur is a valid title as against the United States, when standing alone.
By the certificate of the recorder of land-titles at St. Louis, Lafleur was entitled to 640 acres of land in compensation for lands of his injured by the earthquake in New Madrid county. On this, the survey of April, 1815, is founded. Its return by the surveyor, with a notice of location, to the office of the recorder, was the first appropriation of the land; and not the notice to the surveyor-general's office requesting the survey to be made, as this court held in Bagnell v. Broderick, 13 Peters, 450.
Township 45, in which the land granted to Lafleur lies, was laid off into sections in 1817, and 1818; and we suppose before the survey for Lafleur was made, as his patent, and the survey on which the patent is founded both refer to the township by number as including the land. When the return of the township survey was made to the surveyor-general's office does not distinctly appear, although it is probable it was after Lafleur's location had been made with the recorder.
The location was in irregular form, and altogether disregarded the *52 section lines, and ordinary modes of entry under the laws of the United States. This circumstance lies at the bottom of the controversy. The general land-office at Washington refused to issue a patent on New Madrid locations thus surveyed. The secretary of the Treasury on the 11th of May, 1820, and again on the 19th of June, 1820, called on the attorney-general for his opinion on the validity of such locations, (2 Land-Laws and Opinions, 9, 10,) this officer replied  "That the authority given is, to make these locations on any of the public lands of the territory, the sale of which is authorized by law; but the sale is not authorized by law until the sectional lines are run, and consequently all locations previously made by these sufferers are unauthorized."
To cure this defect, the act of 1822 was passed, which provides, that locations made before that time, under the act of 1815, if made in pursuance of the act in other respects, should be perfected into grants in like manner as if they had conformed to the sectional and quarter-sectional lines of the public surveys; and that the fractions previously created by such locations should be deemed legal fractions, subject to sale: But that after the passing of the act, (26th April, 1822,) no location of a New Madrid claim should be permitted that did not conform to the sectional and quarter-sectional lines. The opinion of the attorney-general appears to have been favourable to locations in conformity to the public surveys actually made, before their return; until returned however, and received at the surveyor-general's office, they could not be recognised as legal public surveys; and in this sense Congress obviously acted on the opinion, and course of the general land-office, in pursuance of it.
The principal difficulties standing in the way of issuing patents, seem to have been the following: There were New Madrid locations made on lands not then surveyed; locations made after the lands had been surveyed, but before the surveys were returned; and locations made on lands surveyed, and the surveys returned; in each case, disregardful of the section lines. But all of them were on lands that had been surveyed, and the surveys duly returned and sanctioned, when the act of 1822 was passed. On this state of facts Congress acted. No distinction was made among the claimants; all fractions created by prior locations, in existing public surveys, were declared legal, and subject to sale; the fractions produced, could not be legal unless the locations producing them were equally so: In this respect, therefore, such locations were binding on the United States from the date of the act. It is insisted, however, that until section No. 45 had been offered for sale by the proclamation of the President, no entry could be made on it by a New Madrid warrant; and in this respect Lafleur's location was void before, and not cured by, the act of 1822, but expressly excepted: that Congress only acted on one defect, that of disregarding the sectional lines, and excluded all others. Township No. 45 was first advertised for sale in 1823.
*53 In addition to what has been said in answer to the argument, it may be remarked, that the New Madrid sufferers were preferred claimants; like others having a legal preference, they had a right to buy, so soon as the officers of the government had by law the power to sell; and sales could be made founded on public surveys. It could not have been intended by Congress that the sufferer should surrender his injured claim, get his warrant from the recorder, and then be compelled to wait until after the public sale, which might sweep all the lands out of which he could obtain a new home. And so the act of 1815 was construed and acted on at the general land-office. No objection seems to have been made there on the ground that these claims had been entered on lands not previously offered for sale at auction; as the President might, or might not order the sale. We think this plainly inferrible from the following order. On the 9th of April, 1818, an act was passed limiting applications to the recorder, for New Madrid warrants of survey, to the 1st of January, 1819. The commissioner of the land-office here, wrote to the recorder at St. Louis, enclosing a copy of the act, a few days after it was passed, saying:
"This act authorizes the reception of claims to the 1st of January next; but as several public sales will take place previous to that day, you must not issue any patent certificates to those claimants after the commencement of such sales, unless the claimant produces a certificate from the register of the land-office to show that the land has not been sold. Should you issue any patent certificate to those claimants previous to the public sales, you will furnish the register of the land-office for the district in which the lands lie with a list of the tracts for which you have issued patent certificates, that he may reserve them from sale."
The 3d section of the act of 1815 makes it the duty of the recorder to deliver to the claimant a certificate stating the circumstances of the case; that is, that the claim had been allowed, surveyed, and recorded in due form, and that he was entitled to a patent for the tract designated: this was to be filed with the recorder if satisfactory to the claimant. Then the recorder was bound to issue the "patent certificate," above spoken of, in favour of the party, which, being transmitted to the commissioner of the general land-office, entitled the claimant to a patent from the United States.
By the foregoing instructions, patent certificates, previous to the public sales, were contemplated as due to claimants for lands entered but not previously offered for sale; and we cannot doubt did exist in large numbers. They, of course, were sanctioned at the land-office. Nor is the consideration of this question presented to this court for the first time. Pettier's claim, in the case of Stoddard v. Chambers, 2 How. R. 317, was like this in all its features except one. It had been located on the same land covered by Bell's concession made by the Spanish government, which had been filed and *54 recorded in 1808, but not recommended for confirmation by the commissioners at St. Louis, for want of occupation and cultivation. By the act of 1811, until the decision of Congress was had, the land covered by the Spanish claim could not be offered for sale, and this restriction was continued. Pettier's New Madrid location was made in 1818, on the land reserved from sale in favour of Bell's concession, and this court held the New Madrid location, and the patent founded on it, void, because the sale of the land "was not authorized by law," and the title of Pettier in violation of the act of 1815. But the court says:  "Had the entry been made or the patent issued after the 20th of May, 1829, when the reservation ceased, and before it was revived by the act of 1832, the title of the defendant could not be contested."
For the reasons assigned, the court was of opinion Pettier's claim would have been valid, had Stoddard's not been interposed. It also lies in township No. 45. So our opinion is, that Lafleur's claim was rendered valid by the act of 1822, unless it can be overthrown by the interposition of Mackay's.
2. This raises the inquiry into its validity in opposition to Lafleur's. That, standing alone, Mackay's was valid against the United States, is in effect decided by this court in Pollard v. Kibbe, 14 Peters, 355, and Pollard v. Files, 2 How. 601, and is free from doubt.
Lafleur's location was made in 1818, and his patent issued in 1827. Mackay's claim was first filed for adjudication before the District Court (U.S.) of Missouri in 1829. Up to this date it had stood as an incomplete claim, requiring confirmation by this government before the title could pass from the United States; to accomplish which a decree in its favour was sought in the District Court, and finally obtained here on appeal; in conformity to which a patent was obtained.
As the proceeding under the act of 1824 was ex parte, Lafleur was not bound by it any further than the legislation of Congress affected his rights; and the question is, how far were they protected, as against incomplete titles brought before the District Court.
By the act of March 2d, 1805, sec. 4, certain French and Spanish claimants were directed, on or before the 1st day of March, 1806, to deliver to the register of the land-office, or recorder of land-titles, within whose district the land might lie, every grant, order of survey, deed, conveyance, or other written evidence of claim, to be recorded in books kept for the purpose. "And if," says the act, "such person shall neglect to deliver such notice in writing of his claim, or cause to be recorded such written evidence of the same, all his right, so far as the same is derived from the two first sections of this act, shall become void, and for ever thereafter be barred; nor shall any incomplete grant, warrant, order of survey, deed of conveyance, or other written evidence, which shall not be recorded as above directed, ever after be considered or admitted as evidence, in any *55 court of the United States, against any grant derived from the United States."
By the act of April 21, 1806, sec. 3, supplemental to the act of 1805, the time for filing notices of claims and the evidence thereof, was extended to the first day of January, 1807: but the rights of such persons as shall neglect so doing within the time limited by the act, it was declared should be barred, and the evidence of their claims never after be admitted as evidence; in the same manner as had been provided by the 4th section of the act to which that was a supplement.
By the 5th section of the act of March 3, 1807, further time for filing notices and evidences of claims was given till the 1st day of July, 1808: But all benefit was cut off from the claimant, if he failed to give notice of his claim, and file his title papers; so far as the acts of Congress operated in giving the title any sanction through the agency of commissioners  and ever after the first of July, 1808, the claim was barred.
It is insisted, however, Mackay's claim is not embraced by the act of 1805, and to which the acts of 1806 and 1807 refer. The act of 1805 does govern the future legislation, interposing a bar. By section 4, French or Spanish grants made and completed before the 1st day of October, 1800, might, or might not, be filed; as the treaty of 1803 confirmed them, they needed no further aid: But complete grants issued after the 1st day of October, 1800  and incomplete titles, bearing date after that time, "shall be filed," says the act. Mackay's claim is of neither description; it was an incomplete title; being a permit to settle and warrant of survey, without any settlement or survey having been made; but dated before the 1st of October, 1800.
The act of 1805, section 4, further provides, that every person claiming lands by virtue of the two first sections of that act, should, by the 1st day of March, 1806, file his notice of claim, title papers, &c., otherwise the claim should be barred. Mackay's claim "was a duly registered warrant of survey," within the words of the 1st section of the act. That the United States had the power to pass such a law we think free from doubt; it being analogous to an ordinary act of limitation, as this court held in Strother v. Lucas, 12 Peters, 448, to which nothing need be added here.
As to the United States, and all persons claiming under them, Mackay's claim stood barred from the 1st of July, 1808, until the passing of the act of May 26, 1824, by which the bar was removed so far as the government was concerned. The time for filing claims under this act was extended by another passed in 1826, and again by that of May 24, 1828, to the 26th day of May, 1829; before the expiration of which time Mackay's claim was filed in the District Court (U.S.) of Missouri, and eventually confirmed in this court on appeal: And the question is, did the acts of 1824, and 1828, and *56 the proceeding had under them, affect Lafleur's title. By the 11th section of the act of 1824, it is provided, "That if in any case it shall so happen, that the lands, tenements, or hereditaments decreed to any claimant under the provisions of this act, shall have been sold by the United States, or otherwise disposed of, it shall be lawful for the party interested to enter the like quantity of lands, in parcels conformable to sectional divisions and sub-divisions, in any land-office in the state of Missouri."
The act of 1828, to continue in force the act of 1824 for a limited time, and to amend the same, declares (in section 2)  "That the confirmations had by virtue of said act, and the patents issued thereon, shall operate only as a relinquishment of title on part of the United States, and shall no wise affect the right or title, either in law or equity, of adverse claimants of the same land."
The foregoing are the conditions on which the bar was removed; these Congress certainly had right to impose, and thereby give a preference to an intervening title acquired during the existence of the bar.
Lafleur was a claimant with a good title in equity, when the act of 1824 was passed; this he well might perfect into a patent, as his equity was expressly protected by the act of 1828, and by implication in that of 1824, (section 11;) neither the patent or entry was affected by the proceedings had on Mackay's claim in the District Court of Missouri, and in this court; nor by his patent issued pursuant thereto: It follows Lafleur's is the better title, and that the decision of the Supreme Court of Missouri must be affirmed.
Mr. Justice McKINLEY.
I dissent from the opinion of the majority of the court, in this case, for the following reasons:
First. According to the act of the 17th of February, 1815, chap. 198, "persons owning lands in the county of New Madrid, in the Missouri territory, with the extent the said county had on the 10th day of November, 1812, and whose lands have been materially injured by earthquakes, shall be, and they are hereby authorized to locate the like quantity of land on any of the public lands of said territory, the sale of which is authorized by law." The section lines of the land had not been run on the 7th of July, 1817, when the location on the New Madrid certificate, under which Gamble claims, was made. The sale of the land, including this location, was not authorized by law, until the year 1823. The 1st section of the act of the 26th April, 1822, chap. 40, could not have legalized the location, because the land was not then subject to sale; and because that section only authorized grants to issue in like manner, as if the location had conformed to the sectional or quarter-sectional lines of the public surveys, if made in other respects, in pursuance of the act of the 17th of February, 1815. Now as the location had not been *57 made in pursuance of that act; and as the 2d section of the act of the 26th of April, 1822, declared "That hereafter the holders and locators of such warrants shall be bound, in locating them, to conform to the sectional and quarter-sectional lines of the public surveys, as nearly as the respective quantities of the warrants will admit, and all such warrants shall be located within one year after the passage of this act; in default whereof the same shall be null and void;" and as no location and survey were made in conformity with the 2d section, the warrant, survey, and patent, are utterly void. See Lindsey v. Miller, 6 Peters, 675.
Secondly. The decree confirming the claim of Mackay's heirs, by the Supreme Court of the United States, under the treaty, was a full and ample admission, that the United States had no right to the land covered by that claim. The title which they acquired to this land, under the treaty, was, therefore, held by them in trust for Mackay's heirs, or any other person having a better title, under the treaty. The decree of confirmation related back to the date of the concession, by the Spanish government, to Mackay, and made the title as complete as if it had been completed by that government before the treaty, notwithstanding the several intervening acts of limitation passed by Congress.
Thirdly. The location, survey, and patent, under which Gamble claimed, being void, the 11th section of the act of the 26th of May, 1824, chap. 173, did not apply to this case. Because, in the language of the section, it did not "so happen that the land" had been sold or otherwise disposed of by the United States. Therefore, Mackay's heirs, or those claiming under them, were not authorized, and much less bound to enter other land in lieu of that confirmed and granted to them by the decree and patent.
Mr. Justice STORY and Mr. Justice WAYNE concur in these reasons.