Matthias, J.
In March 1803, the Congress of the United States enacted a law which provided that 3 per cent of the funds realized from the sale of public lands in Ohio should be returned to Ohio for the purpose of laying out, opening and *405 making roads in the state. (3 Laws of the United States, 541.)
That law is the origin of what are known as the 3 °/o roads in Ohio.
On the passage of the federal law, the Ohio General Assembly created a separate fund for the reception of this money (1 Ohio Laws, 56), and out of such fund money was appropriated for the laying out of specific roads. The road with which we are concerned in the present case is one of these so-called 3% roads, having been created along with other roads by an act of the General Assembly passed February 21, 1812. (10 Ohio Laws, 127.)
The appellants contend that the state’s right of way extends only over the paved portion of the road as it existed prior to the recent widening, whereas the state contends that its right of way extends 33 feet on each side of the center line for a total of 66 feet, basing its claim primarily on the first of the Ohio acts relating to 3% roads.
On the trials of this action in the lower courts, none of the parties could present documentary evidence to establish the right of way acquired by the state when this road was originally laid out.
Thus we must determine whether, as a matter of law, a right of way 66 feet in width was created when this road was first laid out under the provisions of the 1812 act of the General Assembly.
To determine this matter it is necessary to consider the laws relating to roads and highways which were enacted by the General Assembly from the time of the original acts relating thereto (1804) up to the time the present road was created (1812).
An examination of the various highway laws enacted during this period shows that there were two separate series of laws enacted. One was a series of laws relating to highways in general, and the other a separate series of laws relating solely to the 3% roads. As will be subsequently shown, the General Assembly during this period considered the 3% roads *406 as a completely separate road system, neither controlled by nor subject to the general laws relating to highways.
The first of the several laws relating to highways was en- . acted during this period on February 17, 1804 (2 Ohio Laws, 207), and was entitled “An Act for Opening and Regulating Highways.” We will hereinafter refer to laws of that nature as general highway laws.
That law provided “that all roads or highways, established by law, shall be opened, amended and kept in repair or vacated, agreeable to the provisions of this act.” It provided for the filing of an application for a road and the appointment of viewers and surveyors who “shall protract a survey of said road; which, together with the proceedings of the said viewers, shall be certified respectively and returned to said commissioners at their next session, to be held for said county, and the commissioners, on receiving such return, shall cause the same to be publicly read in open meeting, on two different days of the same meeting, and if no objections are made to such proposed road, on the second reading, it shall be the duty of said commissioners, to order the said road opened a necessary width, not exceeding 66 feet, and made in other respects convenient for the passage of travelers, and cause a record thereof to be made, which thenceforth shall be deemed a public road.”
The act provided further the method of filing objections, appointing of. reviewers therefor and assessing of damages. It provided also for the vacation of roads and for the performance of road work.
It is at this point that it first becomes apparent that the General Assembly considered the 3% roads to be something separate and apart from the general highway system and not subject to the general highway laws. Even though the above act very clearly stated that it applied to “all roads or highways, established by lom,'>’> the same General Assembly on the following day, February 18,1804, passed “an act appropriating part of the three per cent granted for laying out, opening and making roads within this state.” (2 Ohio Laws, 136.)
*407 That act appropriated $17,000 “for the purpose of laying out, opening and making roads within this state in the places and manner hereinafter prescribed.” It then listed the specific roads and appointed the commissioners. However, that act was more than a mere appropriation act. It not only appointed the commissioners but created a complete pattern for the building of the roads designated therein, including the letting of contracts and the actual construction of such roads, and provided “that it shall be the duty of each' road commissioner, to cause the road for which he is appointed to be carefully surveyed and plainly marked, on or as near a direct line as the nature of the ground and situation of the country over which the same is to pass, will admit; and all roads laid out under this act, shall be 66 feet in width, and shall be and remain public highways.”
That act will hereinafter be referred to as the original 3% act.
The original 3 Jo act was followed by the passage on January 22, 1806, of another general highway act (4 Ohio Laws, 13), which provided again that all roads and highways were subject to its terms and purported to repeal all prior laws relating to highways. However, on January 27, 1806, only five days after the passage of that general act, the General Assembly again indicated that the 3 Jo roads were not subject to or controlled by the general laws relating to highways, by enacting another 3 Jo act (4 Ohio Laws, 28), which, after listing specific roads to be opened and providing for the appointment of commissioners, incorporated by reference the provisions of the original 3jo act relating to the laying out of such roads. The enactment of such act clearly indicates that the General Assembly considered neither that the original 3 Jo act was repealed by the general laws nor that the general laws controlled the construction of 3 Jo roads.
The next of the many highway acts passed during this period was enacted on February 3, 1807 (5 Ohio Laws, 51). Such act was an amendment of the general highway laws and provided:
*408 “Be it enacted by the General Assembly of the state of Ohio, that ail roads heretofore laid out, or that may hereafter be laid out and opened, under the several acts for appropriating the three per cent granted by Congress for laying out, opening and making roads in this state, shall be under the same restrictions and subject to the same regulations in every respect, as county roads and highways are, agreeable to the provisions of the above recited act * * V’ (Emphasis added.)
This is even a better indication that the General Assembly did not consider the 3% roads subject to the terms of the general laws prior to 1807, since it was thought necessary to enact special legislation to subject such roads to certain provisions of the general laws.
However, it is apparent that that act was intended to provide only for the regulation, repair and maintenance of 3% roads after they were constructed, and that it was not intended to provide therein for the levying out or construction of such roads, since the next day, February 4, 1807, the same General Assembly enacted another 3% act (5 Ohio Laws, 39), which, after appointing commissioners, provided that they “shall, in laying out and establishing such roads, in all respects conform to the provisions of this act, and the act entitled ‘An Act, Appropriating Part of the Three Per Cent Granted for Laying Out, Opening and Making Roads within this State,’ ” i. e., the original 3% act!
A further indication that the 3% roads were considered something separate and apart from the general highway system and not subject to the general laws relating to highways, and that the original 3% act was a general act regulating the construction of all 3% roads is the enactment on January 14, 1808 (6 Ohio Laws, 117), of “an act to amend an act, entitled ‘An Act, Appropriating Part of the Three Per Cent Granted for Laying Out, Opening and Making Roads within this State and, for Other Purposes.’ ” That act in essence provided for the remedying of grievances of persons injured by the construction of 3% roads.
*409 It is significant to note here that the General Assembly when confronted with the problem of such grievances thought it necessary to amend the original 3% act and incorporate the provisions of the general law in such act to provide a remedy therefor.
The next pertinent act with which we are concerned is a general act passed February 20,1809 (7 Ohio Laws, 125), again purportedly repealing all former acts. That act provided that all roads were subject to its terms and provided the general method of the opening of roads to a width not exceeding 66 feet. However, although it purportedly covered all roads, the General Assembly on January 28, 1811 (9 Ohio Laws, 67), less than two years later, found it necessary to enact legislation to place the 3% roads under the general act so far as regulation and alteration thereof were concerned.
That act provided:
“Sect. 1. Be it enacted by the General Assembly of the state of Ohio, that the several roads and highways laid out and opened in this state, under the three per cent fund, granted by Congress for laying out and opening roads in this state, shall be subject to such regulations and alterations, by the commissioners of the several counties, as county roads are by the before recited act, any thing in the the several acts, making appropriations of the said three per cent fund, to the contrary notwithstanding.” (Emphasis added.)
Although providing for the alteration and regulation of 3% roads, that act made no provision for the laying out or construction of such roads and obviously concerned only the regulation, repair and maintenance of existing 3% roads.
It is argued that language in the acts of 1809 (7 Ohio Laws, 125) and 1811 (9 Ohio Laws, 67) operated to effectively repeal the original 3% act, specifying that all 3% roads “shall be 66 feet in width,” although not specifically so doing, and to encompass within their scope all roads either theretofore existent or thereafter to be laid out and opened in the state, leading to the asserted conclusion that all roads, including 3 jo roads, *410 were to be opened only to a necessary width not exceeding 66 feet.
The fallacy of such argument becomes clear upon a consideration of the terms of such acts with the terms of subsequent acts of the General Assembly.
The act of 1811 is claimed to be but a clarification of the act of 1809, with respect to 3% roads. The act of 1809 was entitled, “An Act for Opening and Regulating Roads and Highways,” and provided in no uncertain terms that “all roads and highways, established by law, shall be opened, amended and kept in repair, or vacated, agreeably to the provisions of this act; and the county commissioners * * * shall have authority, upon application, to make and enforce all orders necessary therefor. ’ ’
Casual observation of that part of the act of 1809 would seem at first glance to support the argument set out.
However, a more than casual glance at that act shows that the Legislature further provided “that every application for a road, shall be by petition, specifying particularly where such road shall begin, the remarkable places by which such road is intended to pass, if any, and where the same shall end, signed by at least 12 landholders of the county; and such petition shall be presented to the [county] commissioners by one of the first 12 signers of the same, who shall enter into bond * * * for the costs arising on such petition * # * unless the road so petitioned for, shall appear to the [county] commissioners to be of general and public utility to the citizens of the state or county at large, then the costs attending the same, shall be paid out of the county treasury.”
That act further provided that, “upon the presenting of a petition, in the form aforesaid,” the county commissioners shall “order such petition to be audibly read in open meeting [of the county commissioners], and thereupon shall appoint three disinterested landholders, who * * * shall proceed * * * to view the ground along which said road is proposed to be conducted * * * and if a majority of said landholders shall be of opinion that such proposed road, if estab *411 listed, would not be useful nor of public convenience, they stall report accordingly.”
Ttat act also provided ttat at the meeting at wtict tte county commissioners appoint tte above described viewers, they stall also appoint a “skillful surveyor” who was, with “two active men, as chain carriers, and one marker,” to accompany tte viewers, survey and mark out (ttat is, he was to “lay out”) tte proposed road and certify his findings back to the county commissioners at their next meeting. Thereupon, if no objections were made to the proposed road tte county commissioners “shall order such road to he opened a necessary width not exceeding 66 feet.”
Then, in section 10 of ttat act, dealing with the procedure for vacating “any public road [wtict] stall be considered useless, and tte repairing thereof * * * an unreasonable burthen,” tte General Assembly added a proviso as follows:
“* * * and all roads laid out under tte authority of tte * * * [original 3% act] and tte several acts amendatory thereto, stall be kept in repair, and be liable to tte same order as is provided in this act, anything contained in any otter law to the contrary notwithstanding.”
Tte above excerpts from the act of 1809 show ttat it was very comprehensive in nature and ttat, although tte General Assembly delegated to tte county commissioners authority to authorize tte construction of tte roads contemplated by tte act, it was very explicit in providing tte procedure to be followed by tte county commissioners in their exercise of such authority.
Keeping in mind tte positive language of tte General Assembly in tte act of 1809 ttat “all roads * * * stall be opened * * * agreeably to tte provisions of this act,” its direction that “every application for a road, stall be by petition” and its specific requirements as to tow such petition must be handled in order that it result in tte building of a road, we approach tte act of tte General Assembly of February 21, 1812 (10 Ohio Laws, 127), wherein tte road here under consideration was authorized and directed to be built.
*412 The act of 1812 was entitled, “An Act Making Further Appropriations of the Three Per' Cent Fund, Granted by the United States for Laying Out, Opening and Making Roads in this State,” and, after appropriating “a sum not exceeding thirty-five thousand dollars * * * for the purpose of opening and repairing roads in this state, in manner hereinafter prescribed,” it provided:
“Sect. 4. Be it further enacted, that there be appropriated in the county of Cuyahoga * * * for opening a road from Cleave-land to the south line of Cuyahoga County, in the best direction towards Mansfield, in the county of Richland, two hundred dollars.”
After making specific distribution of the appropriation “not exceeding thirty-five thousand dollars” to a total of 41 counties in addition to Cuyahoga for the opening and repair of roads, and, as we have seen, directing the specific route of new roads directed to be built, that act further provided:
“That there shall be appointed by a joint resolution of both houses of the General Assembly, one commissioner, to lay out and expend the money * * * for repairing any old road * * * and in like manner there shall be appointed two commissioners, to lay out and expend the money * * * for laying out and opening any new road * * * unless it be thought expedient to appoint one commissioner in each county for such roads as are designed to connect county seats of justice or places in different counties * * * and each commissioner appointed under the authority of this act [that is, each state road commissioner] shall give bond, with sufficient security to the commissioners of the county wherein he resides * * * conditioned for the faithful discharge of the duties required of him by law as [state road] commissioner [that is, a simple performance bond such as that required to be given by the “road commissioners” of the original 3% act (2 Ohio Laws, 140 et seq.)] * * * and each [state road] commissioner appointed for any new road, shall be entitled to two dollars for each mile of road they lay out and open * * (Emphasis added.)
On the same day that act was passed (February 21, 1812), *413 there was passed by both houses of the General Assembly “a resolution appointing certain road commissioners (10 Ohio Laws, 205), which provided “that the following persons be and they are hereby appointed commissioners agreeable to the provisions of * * * [the act of February 21,1812, supra], to wit:
“In Cuyahoga County * * * for the road from Cleaveland to Mansfield in the county of Richland, Ariel McArthur and Peter Kinney * * *.”
The mere quotation of the pertinent parts of the acts of 1809 and 1812, supra, shows that under the argument advanced they were inconsistent, conflicting and could not stand together, since it is apparent that if the acts of 1809 and 1811 are to be given the meaning asserted the Legislature must be held to have precluded itself from passing the act of 1812!
If the act of 1809 meant that all roads, including 3% roads, laid out subsequent thereto were to be laid out “agreeably to” its provisions, then all roads, including 3% roads, must be initiated by petition and such petition must be processed by the county commissioners according to the statutory directions hereinbefore set out. Under such interpretation, the Legislature must be held to have abandoned its right to designate the course and direction of state roads and its prerogative to appoint state road commissioners to build them. It must be held to have relegated itself to the position of having to petition the county commissioners to build a road it felt would benefit the state, and leave the final decision as to whether such road would be built in the hands of “viewers” and the county commissioners. Not only is the result of such an interpretation rendered impracticable by the provisions of the act of 1809 requiring that each petition must be signed “by at least 12 landholders of the county” wherein the road would be located, but in allowing such proposed road to be subject to inspection by “viewers” and to final authorization by county commissioners the Legislature must be held to have abandoned all interest in and control over the creation of an integrated sys *414 tem of roads and highways connecting various parts of the state with each other and with roads and highways leading into the state from other states.
Of course, we might adopt the reasoning of the argument advanced and find that since the acts of 1809 and 1812 were conflicting and the act of 1812 was later in time, the act of 1812 must have been intended to repeal the act of 1809; but then, of course, the county commissioners would be left without the power to establish local county roads.
It is seen that it is more consistent with common sense and good reasoning, as well as with our usual policy of giving due credence to each enactment of the General Assembly, to conclude, as we do, that:
I. During the entire period under consideration there existed in the state of Ohio two separate and distinct road systems created and controlled by separate series of laws.
II. Aside from the general highway laws authorizing the construction of county roads, there were separate laws concerning the construction of roads with money from the 3% fund, which roads were neither created by nor originally subject to the general laws relating to county roads.
III. The original 3% act was intended to be and was considered by the General Assembly during this entire period as a general act providing for the specifications, laying out and construction of all 3% roads.
It is noted that such conclusions are supported by later acts of the General Assembly in the same era under consideration, as well as by existing sections of the Revised Code.
See 22 Ohio Laws, 303 (1824), “an act defining the mode of laying out and establishing state roads,”, wherein it was provided that “all state roads that shall be hereafter established agreeably to the provisions of this act, shall be opened and considered public highways 66 feet wide.” See, also, 22 Ohio Laws, 305 (1824), “an act for opening and regulating roads and highways,” wherein it was provided that “all county and township roads, shall hereafter be laid out and established *415 agreeably to the provisions of this act, and all county roads shall be 60 feet wide, and township roads not exceeding 40 feet wide.” It is highly significant to this court that the former act (22 Ohio Laws, 303), dealing with “all state roads to be hereafter laid out within this state,” said that “whenever the General Assembly shall by law authorise any road or roads to be laid out and established within this state, and shall appoint commissioners to lay out and establish the same, said commissioners shall * * whereas the latter act (22 Ohio Laws, 305), passed the next day, provided “that all roads and highways which have been or may hereafter be laid out and established agreeably to law, within this state, shall be opened and kept in repair in the manner hereinafter provided * * * [and] that all applications for laying out or altering any county road shall be by petition to the [county] commissioners, signed by at least 12 landholders of the county * * *.”
See, also, Sections 5535.01 and 5511.01, Revised Code.
Section 5535.01 provides:
“The public highways of the state shall be divided into three classes: state roads, county roads, and township roads.
“(A) State roads include the roads and highways on the state highway system.
“ (B.) County roads include all roads which are or may be established as a part of the county system of roads * * *.
“(C) Township roads include all public highways other than state or county roads.”
Section 5511.01 provides, in part :
“All state highways established by law shall continue to be known as state highways, and the state highway system established by law shall continue to be known as the state highway system.” (Emphasis added.)
A consideration of all the acts we have mentioned herein, giving due credence to the intent and purpose of each, leads but to the conclusion, as hereinbefore set out, that the General Assembly has, from 1804 to date, considered the establishment of state roads to be in a completely separate category from county *416 roads and, accordingly, has consistently enacted separate legislation regarding the establishment of each. It is our opinion that to refuse to recognize the intent of the General Assembly to treat the establishment of such roads separately merely because it did not specifically exempt the laying out and opening of 3% state roads from the general acts it passed with respect to the laying out and opening of local county roads, and because it at times gave the county commissioners the duty of maintaining and regulating such state roads, would not only defeat the legislative intent but would invariably lead to chaos and confusion in later attempts by courts to deal with these statutes.
With respect to the particular 3% road before us, our reasoning is that, since all 3 Jo roads were constructed under the terms of the original 3% act, the highway in question and the extent of the right of way acquired are controlled by the original 3% act. The original 3% act provided that “all roads laid out under this act, shall be 66 feet in width, and shall be and remain public highways.” Thus, as a matter of law, the right of way of the state with respect to this part of U. S. Route 42 is 66 feet wide, and to the extent appellants were occuying such right of way they were encroaching.
Appellants rely on the case of Broadsword v. Kauer, Dir., 161 Ohio St., 524, 120 N. E. (2d), 111, 46 A. L. R. (2d), 1309, to support their argument that the state, in order to show prior acquisition of a highway right of way which it is not presently using and which has for some time been occupied by a private citizen, must prove, by deed or by other probative evidence, its ownership thereof. It is clear to this court, however, that there is another way to prove such prior acquisition, and that is, as we have hereinbefore shown, by reference to the statute pursuant to which the original right of way was acquired.
The Broadsword case does not support appellants’ argument for other reasons.
The Broadsword case dealt with two roads — (1) a road from Canfield to Atwater and (2) a north and south road through Ellsworth, in Trumbull County. As “evidence intro *417 duced * * * which is uncontradicted,” this court accepted the following as facts:
“*-* * In November 1805, a petition was filed by certain citizens with the county commissioners of Trumbull County to appoint a committee to lay out a road (now highway No. 224) from Canfield to Atwater. In Juné 1806 the report of that committee was received by the county commissioners and was approved and the road was ordered [by the county commissioners] to be ‘opened agreeable by law 50 feet wide.’
11 # * #
“In June 1807, a similar petition was filed with the county commissioners of Trumbull County to establish a north and south road (highway No. 45). That petition was granted [by the county commissioners] in March 1808. The order granting that petition established the north and south road on the center line through the center of Ellsworth ‘50 feet in width.’ ” (Emphasis added.)
The controversy in the Broadsword case concerned land at the intersection of such two roads, and the decisive issue in that case was whether the state had later acquired a right of way of more than the original 50-foot width. Under such circumstances, the state was very properly required to prove, by probative evidence, that it had acquired such additional right of way, with respect to persons in peaceful possession of such disputed property, and we are in wholehearted accord with the findings in the Broadsivord case.
As we have seen, however, the very heart of the controversy in the instant case was accepted as one of the basic facts of the Broadsword case. There was no question of the width of the original right of way acquired by the state in that case, and, even if there had been, that case would still not be pertinent to the present inquiry for another reasoii.
Of the myriad of statutes pertaining to the laying out, opening, control and maintenance of roads in Ohio which this court has reviewed in connection with the instant problem, many are printed in Chaucerian script, and seven which are pertinent were enacted prior to 1808, the year in which the latter of the *418 roads in the Broadsword case was established. See 2 Ohio Laws, 136; 2 Ohio Laws, 207; 4 Ohio Laws, 13; 4 Ohio Laws, 28; 5 Ohio Laws, 39; 5 Ohio Laws, 51; and 6 Ohio Laws, 117.
The quoted portions of the Broadsword case show that both the roads considered therein were initiated by petition. As already shown herein, the seven early statutes made clear distinctions between 3 °/o roads and other roads in the state which are, in later statutes, called “county roads.” One of such distinctions was the manner of initiating the laying out and opening of the two types of roads. The statutes clearly indicated that 3% roads were to be initiated and authorised by the Legislature, while other (.“county”) roads could be initiated by petition of local citizens and authorised by county commissioners. Upon initiation by such petition, the statutes allowed the county commissioners to authorize the latter roads to be opened to “a necessary width not exceeding 66 feet” (except for the interval between 1806 and 1809 when the width of “county” roads was limited to “a necessary width not exceeding 50 feet” [4 Ohio Laws, 13, 14], as exemplified by the 50-foot widths of the roads in the Broadsword case), whereas, upon initiation by the Legislature, the statute provided that all 3% roads “shall be 66 feet in width. ’ ’
Once it becomes apparent that the roads considered in the Broadsword case were not 3% roads, it is apparent that another distinction exists between the facts of that ease and this, and that that case is not pertinent to our consideration of the facts of the present case — even though it be admitted that the admissibility of the state’s exhibits in the present case might be questioned under the rule of evidence relating to ancient documents which was established in the Broadsword case.
The instant case deals with a rule of law, not a rule of evidence. Rules of evidence are applicable only where it is necessary to establish something as a matter of fact, not as a matter of law. Here, as a matter of substantive law, roads were laid out and became public highways to a width of 66 feet. While it is regrettable that hardship may be imposed on certain of the adjoining landowners by the operation of this law, it has never *419 been the policy of the courts to change rules of substantive law just because their operation imposed hardship on certain individuals. Such is not the function of courts of last resort.
A brief reflection on the state of affairs in Ohio in 1803, the year in which it was recognized as a state, is sufficient to indicate the reason and necessity which persuaded the early sessions of the Legislature to provide for two separate and distinct authorities for locating and initiating construction of roads in the state. The two authorities were, as indicated, the state Legislature itself and the county commissioners.
Although it is difficult to envision the fact in this day of modern cities, precisely fenced-in farms and superhighways, the state of Ohio in 1803, only 156 years ago, was almost entirely a wilderness. Ohio was at that time the “western frontier” of the nation.
In fact, in 1803, at the time Ohio was recognized as a state, roughly one-third of .the land in the state was still claimed by Indians! Boughly two-thirds of the territory of the state was-ceded by the Indians in 1795 in the first Greenville Treaty, the signing of which was supervised by General “Mad Anthony” Wayne. It was not until 1814 (two years after the legislation concerning the present road was enacted) that the second Greenville Treaty, signed by the Wyandots, Delawares, Shawuees, Senecas and Miamies, established ownership of all the territory in the state in the “white man” — and even after that there existed in Ohio populated Indian reservations until 1842, the date of the enforced migration to Oklahoma of the Indians of the Sandusky Reservation. Also in the year 1814, Cleveland was made a village corporate “to be known and distinguished by the name of ‘the village of Cleveland’ ” (13 Ohio Laws, 17), and, in 1 Howe’s Historical Collections of Ohio, it is reported:
“For nearly 20 years ferocious wild beasts of the dense forests in and surrounding Cleveland annoyed and terrified the inhabitants. Bears entered their gardens and dwellings even in the daytime, and at night invaded the barnyards and pigsties, killing and carrying off young porkers, calves and shéep; and ■wolves beset the night traveler on streets and avenues now *420 lined with costly residences and palatial mansions.” (Emphasis added.)
During the period in which these first road statutes were being enacted, many of the men were still living and active who had roamed Ohio and the territory that was to become neighboring states and whose names are legendary for their participation in the Indian wars. Daniel Boone lived until 1820; Lewis Wetzel, implacable foe of the Indians and the only man reported to have accomplished the remarkable feat of being able to reload his muzzle-loading rifle at a dead run with Indians in hot pursuit, lived until 1836; Simon Kenton, another prominent Ohio Indian fighter, also lived until 1836; and the infamous Simon Grirty, the white renegade who, as a “front-row spectator,” so thoroughly enjoyed the burning at the stake of Colonel William Crawford at Upper Sandusky in 1782, lived until 1818.
It is interesting and significant to note that in the original statute pertaining to the establishment of 3% roads, the Legislature demanded that the trees in the roadbed be cut to within at least one foot from the ground! (2 Ohio Laws, 136.) It is apparent that the term, “road,” brought quite a different picture to the mind of the person living in Ohio around the turn of the 19th century than it brings to the mind today. A “road” in those days, at least in Ohio, was conceived as nothing more than a more or less clearly defined stump-infested swath through the forest over which persons afoot, on horseback or in wagons could traverse with some degree of assurance as to where it Avould lead them. It is also apparent that the “opening” of a road in those days meant nothing more than the felling of trees Avithin the bounds of the prospective road as it had been “laid out.” “Opening” a road in those days certainly did not mean gravelling, paving or curbing it, and travel as we know it today wa,s unknown.
Today we make the journey from Cincinnati to Cleveland in a matter of hours by automobile over graded and paved roads. Around the turn of the 19th century, the same journey took days, and even then only the traveler who could defend himself against occasional Indians and wolves, bears and other “fero *421 cions wild beasts of the dense forests, ’ ’ and who knew at exactly wbat point to turn from a buffalo trail onto a deer trail, was qualified to undertake tbe journey.
Such conditions were hardly conducive either to the internal welfare of the state of Ohio or to the equalizing of its status with the status of states already in the union it had joined. Many of such states already had extensive road systems, and some of them, it may be presumed, had roads entirely free of stumps— even small ones only one foot high.
As an integrated body politic, Ohio had assumed an obligation to grow and progress along with its sister states. One of such obligations was the establishment of a system of public roads and highways to aid commerce, communication and transportation among the various parts of the state and neighboring states. The federal government realized that the laying out and opening of such a road system was of vital importance to the growth of Ohio and for that reason agreed to return to the state only for that purpose 3% of all moneys derived from the sale of public lands in the state.
In turn, the Legislature of the new state, in the fulfillment of such obligation and in the furtherance of the federal plan, took complete charge of such road-building program, proceeded to determine, individually, the location of each such 3%.“state” road, and, in order to insure uniformity in such system of roads, determined in clear and unequivocal terms the width to which each of such roads must be layed out, i. e., it determined by law the width of the right of way which must be acquired for a,ny highway which was to be built with the 3% money.
Compare this with the early statutes concerning roads not to be financed with 3% money. They could be initiated by the petition of local citizens, were authorized to be laid out and opened by county commissioners only to a necessary width not exceeding 66 feet (except for the interval between 1806 and 3.809 already mentioned and which illustrates the point clearly) and were obviously geared to accommodate local and regional road needs and desires rather than to fit into a road-building program for the benefit and welfare of the state as a whole. It is for such reasons that they were considered separately and *422 distinctly throughout all the legislation considered herein (covering the period between 1803 and 1813), and it is for such reasons that it was determined that they did not necessarily need a right of way 66 feet in width, although a right of way of such a width was permissible if the occasion called fpr it, except during the interval mentioned when the maximum width of a “county” road was even less than 66 feet.
From what we have said, it is apparent that to assume that the road in the instant case was laid out to a width of less than 66 feet, regardless of the extent to which it was opened, would be to presume that the public officials upon whose shoulders rested the responsibility of bringing it into existence according to the law as it read at the time failed in their duty. Courts should not and do not indulge in such presumptions. In fact, the usual presumption is that a public official has done his duty according to law; and, in the absence of proof to the contrary in addition to mere occupancy, it will be conclusively presumed that the road here under consideration was laid out in accordance with law, i. e., that the state acquired either title to or an easement of way over (the distinction being immaterial to the question herein) a strip of land 66 feet in width at the time it was laid out.
It is, of course, fundamental that adverse rights cannot run against the state (Haynes v. Jones, 91 Ohio St., 197, 110 N. E., 469, and Lindsey v. Lessee of Miller, 31 U. S., 666, 8 L. Ed., 538), and the assertion by one who is clearly encroaching upon state property of the presumption that possession of property peaceably acquired is lawful (Broadsword v. Kauer, supra) cannot be used to circumvent that fundamental principal, no matter how peaceful the encroachment has been or for how long.
The judgment of the Court of Appeals is affirmed, but for the reasons herein set out, and final judgment is rendered for the defendant.

Judgment affirmed and final judgment for defendant.

Weygandt; C. J., Zimmerman and Herbert, JJ., concur.
Taft and Beél, JJ., dissent.
Peck, J., not participating.