44 U.S. 650
 3 How. 650
 11 L.Ed. 767
 LESSEE OF WILLIAM L. BROWN AND WIFE, PLAINTIFF IN ERROR,
v.
JOSEPH CLEMENTS AND JONATHAN HUNT, DEFENDANTS IN ERROR.
 January Term, 1845
 
 1
 THIS case was brought up, by writ of error, under the twenty-fifth section of the Judiciary Act, from the Supreme Court of the state of Alabama.
 
 
 2
 It was an ejectment, brought by the plaintiffs in error to recover 2 40/100 acres of land, in the possession of Clements as the tenant of Hunt. The plaintiff claimed title through a patent to James Etheridge, and the defendants through a patent to W. D. Stone. Both Etheridge and Stone claimed as pre-emptioners under the act of Congress, passed on the 29th of May, 1830.
 
 
 3
 The question depended upon the manner in which the fractional section twenty-two, in township four south, of range one west, in the district of lands subject to sale at St. Stephens, Alabama, should be laid out.
 
 
 4
 A reference to the annexed diagrams will make it more intelligible.
 
 
 5
 Nos. 1, 2, 3, 4 represent the whole section; but in consequence of prior claims or grants, only that part of it included within 1, 5, 6, 7, 8, 9, 10, was subject to entry, containing the entire south-west quarter-section, and some additional land upon the east and north. The surveyor divided the whole of this into two parts by a line running from 11 to 12, one of which parts (marked A) contained 92.67 acres, and the other (marked B) contained 110.50. The plaintiff claimed to extend the part A over the whole square which constituted the quarter-section, as represented by dotted lines.
 
 
 6
 On the 28th of January, 1831, Etheridge presented the following application and affidavit:
 
 
 7
 'To the Register and Receiver of the Land-office at St. Stephens:
 
 
 8
 'You will please to take notice that I, James Etheridge, of Mobile county, Alabama, claim the right of pre-emption, under the act of Congress of the 29th May, 1830, to the southwest quarter-section 22, t. 4, r. 1 west.'
 
 
 9
 Affidavit.—'James Etheridge, being sworn, maketh oath that the above described tract of land was planted and cultivated by him in the year 1829, and remained in his possession from the year 1829 until after the 29th May, 1830. That the said land was occupied and cultivated by him in his own right, and not as the tenant of any other person. That the said land was enclosed with his own fence, and that there was no person concerned with him in the occupation and cultivation of the said land; and that the present claim does not interfere with the right of any other person, and that he believes he is entitled to the same under the act of Congress of the 29th May, 1830, and that the said tract is within the corporate limits of the city of Mobile.
 
 
 10
 J. ETHERIDGE.'
 
 
 11
 The affidavit was sustained by the oaths of Daniel Robertson and John Carr.
 
 
 12
 On the 25th of March, 1831, Stone presented the following application and affidavit:
 
 
 13
 'To the Register and Receiver of the Land-office at St. Stephens, Alabama:
 
 
 14
 'You will please to take notice that I, William D. Stone, of Mobile county, Alabama, claim the right of pre-emption, under the act of Congress of the 29th of May, 1830, to the fraction situated in the west part of the south-east quarter of section 22, in township 4, range 1, west of 13.
 
 
 15
 WILLIAM D. STONE.'
 
 
 16
 Affidavit.—'William D. Stone, being sworn, maketh oath that the above described tract of land was planted and cultivated by him in the year 1829, and remained in his possession from the year 1829 until the 29th May, 1830, and that the said land was occupied and cultivated by him in his own right, and not as the tenant of any other person. That the said tract of land was enclosed with his own fence, and that there was no person concerned or connected with him in the cultivation of the said land, and that this present claim does not interfere with the rights of any other person; and further, that the tract described is within the present corporate limits of the city of Mobile.
 
 
 17
 WILLIAM D. STONE.'
 
 
 18
 The affidavit was supported by the oaths of Samuel H. Garrow and James Dowell.
 
 
 19
 On the 20th of June, 1831, the register and receiver issued the following certificate:
 
 
 20
 E.—Extract from abstract of claims to pre-emption, under the act of 29th May, 1830.
 
 
 21
 'Land-office, St. Stephens, Alabama.
 
 
 22
 Abstract of claims to pre-emptions to lands that are reported to have been surveyed, but the township plats not furnished to this office.
 
 
 23
 Tract. Quantity. Rate. Amount.
 
 
 24
 No. By whom claimed. Residence.
 
 
 25
 Sec. T. R. D. C. D. C. D.
 
 C.
 
 26
 2 Jas. Etheridge Mobile S.W. qr. - 22 4 1 W.
 
 
 27
 15 Wm. D. Stone Do. Fraction 22 and 27 4 1 W.
 
 All lying south of 31x except claim No. 40
 
 28
 'Land-office, St. Stephens, Ala., June 20, 1831.
 
 
 29
 'It is the opinion of the undersigned, that the foregoing claimants are each entitled to the right of pre-emption, under the act of Congress of the 29th May, 1830, to the tract or tracts by them claimed, and annexed to their names respectively, in the foregoing abstract.
 
 
 30
 JOHN B. HAZARD, Register.
 
 
 31
 J. H. OWEN, Receiver.'
 
 
 32
 The account of sales was entered in the book at some period which the record does not show, and was as follows:
 
 
 33
 Extract from account of land sold by register and receiver.
 
 
 34
 'Account of lands sold, and moneys entered in payment therefor, in April, 1832.
 
 
 35
 By whom purchased. Tract.
 
 When No. of
 
 36
 sold. Purchaser. Residence. receipt. Section. T. R. Acres. Price. Amount.
 
 1832.
 
 37
 April 30 James Etheridge Mobile 4,539 S.W. qr. 22 4 So. 1 W. 9,267 1 25 115 83 Pre-emption
 
 
 38
 " Wm. D. Stone Do 4,547 S.E. subdiv. 4 So. 1 W. 11,050 1 25 t.
 
 qr. sec. 22
 
 39
 On the 30th of April, 1832, the register gave to Etheridge the 31s following certificate:
 
 G.—Certificate.
 
 40
 'Pre-emption No. 4,539, act 29th May, 1830.
 
 
 41
 'Land-office, St. Stephens, Ala., April 30, 1832.
 
 
 42
 'It is hereby certified, that, in pursuance of law, James Etheridge, of Mobile county, Alabama, on this day purchased of the register of this office, the lot or south-west quarter of section number twenty-two, of township No. 4 south, in range number one west, containing ninety-two 67/100 acres, at the rate of one dollar and twenty-five cents per acre, amounting to one hundred and fifteen 83/100 dollars, for which the said James Etheridge has made payment in full, as required by law.
 
 
 43
 'Now, therefore, be it known, that on presentation of this certificate to the commissioner of the General Land-office, the said James Etheridge shall be entitled to receive a patent for the lot above described.
 
 
 44
 JOHN B. HAZARD, Register.'
 
 
 45
 On the same day a certificate was issued to Stone, as appears from the following extract from the record of certificates issued for lands sold.
 
 
 46
 Tract. Quantity Price. Amount.
 
 
 47
 Date of No. of Name. Residence.
 
 
 48
 cer- cer-
 
 
 49
 tificate tificate Sec. or part of Sec. T. R. Acres. Hdth. D. C. D. C.
 
 1832.
 
 50
 April 30 4,539 James Etheridge Mobile co. Southwest 22 22 4 1 W. 92 67 1 25 115 83
 
 
 51
 " 4,547 Wm D. Stone Do. S.E. sub. frac. 22 4 1 W. 110 50 1 25 138 13
 
 
 52
 On the 17th of December, 1832, a patent was issued to Stone. It granted the land described in the following preamble:
 
 
 53
 'Pre-emption certificate, No. 4,549.—The United States of America, to all to whom these present shall come, greeting:
 
 
 54
 'Whereas William D. Stone, of Mobile, has deposited in the General Land-office of the United States a certificate of the register of the Land-office at St. Stephens, whereby it appears that full payment has been made by the said William D. Stone, according to the act of Congress of the 24th of April, 1820, entitled 'An act making further provision for the sale of the public lands,' for the south-east subdivision of fractional section twenty-two, in township four, south of range one west, in the district of lands subject to sale at St. Stephens, Alabama, containing one hundred and ten acres and fifty one-hundredths of an acre, according to the official plat of the survey of said land returned to the General Land-office by the surveyor-general, which said tract has been purchased by the said William D. Stone.
 
 
 55
 'Now know ye,' &c., &c.
 
 
 56
 On the 30th of May, 1833, a patent was issued to Etheridge for the land described in the preamble.
 
 
 57
 'Pre-emption certificate, number 4,539.
 
 
 58
 'The United States of America, to all to whom these presents shall come, greeting:
 
 
 59
 'Whereas, James Etheridge, of Mobile county, Alabama, has deposited in the General Land-office of the United States a certificate of the register of the Land-office at St. Stephens, whereby it appears that payment has been made by the said James Etheridge, according to the provisions of the act of Congress of the 24th April, 1820, entitled 'An act making further provisions for the sale of the public lands,' for the south-west quarter of section twenty-two, in township four, south of range one west, in the district of lands subject to sale at St. Stephens, Alabama, containing ninety-two acres and sixty-seven hundreths of an acre, according to the official plat of the survey of the said lands returned to the General Land-office by the surveyor-general, which said tract has been purchased by the said James Etheridge.
 
 
 60
 'Now know ye,' &c., &c.
 
 
 61
 In April, 1838, Brown and wife, claiming under the title of Etheridge, brought an ejectment against Clements for the east half of the south-west quarter of fractional section twenty-two. The case came on for trial at the April term, 1841, in the Circuit Court of the state of Alabama, for the county of Mobile, in the course of which the following bill of exceptions and agreement were filed.
 
 Bill of Exceptions.
 
 62
 'Be it remembered, that upon the trial of this cause, the plaintiffs gave in evidence the paper hereto annexed, marked A, being a duly certified copy of a patent from the United States government to James Etheridge; and thereupon, it was admitted by the defendants, that the plaintiffs had, at the date of the demise, and time of trial, all the rights of said patentee Etheridge in the land described in the declaration. Plaintiffs also gave in evidence paper marked B, hereto annexed, being a plat of a survey made and returned, under an order of this court, by the surveyor for the county of Mobile, and proved by said surveyor that said survey was truly made, according to said order, and that the plat returned shows correctly the external lines and corners of said fractional section twenty-two. That he found the south-west corner of said fractional section, as shown by the plat returned; and also found, on the section lines of said fractional section, the half mile posts, each post being a half mile from the south-west corner of said fractional section. That these posts bore evidence of being those put down by the United States surveyor, on running the section lines. That an entire south-west quarter exists in said fractional section, without interference with any private land claim, and leaving a residuum both on the north and on the east of said quarter-section, as shown by the plat returned by him; and also, that said fractional section contains two hundred and ten acres. The defendants admitted that they were in possession, at the time of service of the declaration, of sixteen acres of the land described in the declaration. The defendants gave in evidence, by consent of plaintiffs, a certified copy of a patent from the United States government to William D. Stone, hereto annexed, marked No. 1; and thereupon, it was admitted by the plaintiffs, that the defendants have all the rights of the said patentee, Stone, in the land admitted to have been in their possession at the time of the service of the declaration.
 
 
 63
 'The defendants offered in evidence duly certified copies of the official township plats of 1832 and 1835, of the township in which the land sued for is situated, (extracts from which are hereunto annexed, marked No. 2,) to show the boundaries and contents of the land described in said patents to said Etheridge and to said Stone, without having offered, or professing to have any other evidence than the plats themselves afford, to prove that the subdivision, corners, and lines dividing said fractional section, as exhibited in the said plats, had been run and marked on the ground. To the admission of which evidence the plaintiffs objected; and their objection was overruled, and said plats allowed to go to the jury. The plaintiffs admitted, that if the line, as marked on said extract from plats (No. 2) dividing lots A and B, is a legal line, lot B, as exhibited, will cover the land sued for.
 
 
 64
 'The plaintiffs further gave in evidence, that the said line and corners, as exhibited on the extract, (No. 2,) had never been run or marked on the ground; and also gave in evidence papers marked C, D, E, F, G, H, being duly certified transcripts of records from the Land-office at St. Stephens, Alabama.
 
 
 65
 'The defendants gave in evidence paper marked No. 3, being a duly certified copy of the instructions of the Secretary of the Treasury, bearing date the 10th day of June, 1820, also 20th January, 1826.
 
 
 66
 'The plaintiffs gave in evidence paper marked I, being a duly certified copy of the circular of the Secretary of the Treasury, of date the 8th day of May, 1832.
 
 
 67
 'Upon the foregoing evidence, the court instructed the jury, that if they believed the same, they must find for the defendants. The court further instructed the jury, that if said fractional section (No. 22) was capable of being subdivided into an entire south-west quarter-section and two half quarter-sections, leaving a residuum as shown by the said map and evidence of the county surveyor, still the surveyor-general was not required, under the acts of Congress providing for the subdivision of the public land, and the instructions of the Secretary of the Treasury, made under the act of the 24th of April, 1820, entitled 'An act making further provision for the sale of the public lands,' to make, in his subdivision of the same, either such quarter-section or half quarter-sections, but might lawfully subdivide the same into two lots, (A and B,) as indicated by said plat of 1832; and that under said evidence, Etheridge's title would not hold the whole south-west quarter of said fractional section, but only lot A, and that Stone's title would hold lot B, being the balance of said fractional section.
 
 
 68
 'To which instructions, and each and every of them, the plaintiffs, by their counsel, except, and pray the court to sign and seal this their bill of exceptions.
 
 
 69
 E. L. DARGAN. [SEAL.]'
 
 
 70
 Agreement of the parties:——
 
 
 71
 'The parties to this cause, not wishing to encumber the record by copying from the book entitled 'General Public Acts of Congress respecting the sale and disposition of the public lands, with instructions issued from time to time by the Secretary of the Treasury and commissioner of the General Land-office, and official opinions of the attorney-general on questions arising under the land laws,' and which instructions are contained in the 2d volume, part 2d, prepared and printed by order of the Senate, agree that said book may be used by either party, and any thing therein contained read as illustration of the practice of the Land-office, and construction that the acts of Congress had received in that branch of the government. The same work can be referred to by either party in the Supreme Court, for the purpose aforesaid. The parties further agree, that for exhibit No. 2, being the official map of the survey of the township described in the patents of both plaintiffs and defendants, the map contained in the same book above described, between pages 134 and 135, shall be referred to as if the same was incorporated with, and formed a part of the record in this cause.
 
 
 72
 SHERMAN & CHAMBERS, Attorneys for plaintiffs.
 
 
 73
 GORDON, CAMPBELL & CHANDLER, Attorneys for defendants.'
 
 
 74
 The jury having found for the defendants under the above instructions, the case was carried to the Supreme Court of the state of Alabama, where the opinion of the court below was affirmed.
 
 
 75
 A writ of error brought it to this court.
 
 
 76
 Willis Hall and Sherman, for the plaintiff in error.
 
 
 77
 Jones, for the defendants in error.
 
 
 78
 Hall stated the case, and claimed the entire quarter-section. It was not within the exceptions of the act of 1830, being neither reserved nor appropriated. The agent of the United States cannot prescribe any other conditions than those which are found in the law. The south-west quarter of section 22 is a specific thing. A patent was issued to Etheridge for it. It is true that the patent says that it contains only ninety-two acres and sixty-seven hundredths, but this is mere surplusage, and does not detract from the legal efficacy of the grant. 6 Cow. (N. Y.), 706.
 
 
 79
 The defendant in error settled upon the south-east quarter, but there were previous claims to a part of it, which had a preference, and he only claimed what remained. Stone's claim to the south-east quarter was put in three months after ours. In order to effect a valid title under the pre-emption law, three things are required.
 
 
 80
 1. The land must belong to the United States, and be unappropriated.
 
 
 81
 2. It must conform to the regular and legal subdivisions.
 
 
 82
 3. The settlement must be upon the quarter-section which is claimed.
 
 
 83
 The patents of the parties in this case do not clash with each other. One is for the south-west quarter-section, and the other for the south-east subdivision. A subdivision is not a legal term, and is synonymous, in this case, with quarter. The part claimed by the defendant in error is called by different names, for example, 'a fraction of 22,' 'south-east subdivision,' 'fraction and south-east subdivision,' and 'southeast sub-fraction.' They all mean the same thing, which is, a fractional part of the south-east quarter-section. The dispute has arisen because the surveyor has drawn a line not authorized by law, dividing the section into two parts. The authority which is supposed to exist for such a line is the law of 1820, (1 Land Laws, 323;) but we say that this law does not apply to the case, or if it does, that it is controlled by the act of 1830, which says that we are entitled to a quarter-section. But these laws are not inconsistent with each other. 13 Pet., 498.
 
 
 84
 All the laws, beginning with the ordinance of 1785, which directs the public lands to be laid off into townships, and coming down to the law of 1832, (1 Land Laws, 493,) have the same system in view, viz.: running the lines geographically, and laying the land off into squares. The acts of 1804 and 1805, (1 Land Laws, 104, 108,) requiring lands to be laid out and offered for sale in quarter-sections, are unrepealed, for the act of 1820 refers to them, and recognizes the same mode of running out the lines. Laws must be construed together. Dwar. Stat., 674. The act of 1820 supposes that the land is already laid off in quarter-sections, and not that new lines are to be run. The reference to the rules which the Secretary of the Treasury is authorized to prescribe, is to the manner of executing the established provisions of existing laws, and not that the system itself should be changed. The word 'fraction' in the law must be construed to mean the piece which is left after a quarter-section is carved out. The object of all the land laws (which Mr. Hall examined in detail) is twofold. 1st. To avoid a conflict as to boundaries, because each man's possession is a regular geometrical figure; and, 2d. To guard against favoritism and partiality, by requiring the whole figure to be purchased. After the surveyor-general had run these lines, he was functus officio, and had no right to obliterate them, unless by a fresh act of Congress. We contend:
 
 
 85
 1. That this quarter-section is given to us by the act of 1830.
 
 
 86
 2. That there have been no laches on our part.
 
 
 87
 3. That we have the higher equity, our claim being two or three months earlier than that of the other side.
 
 
 88
 Sherman here gave notice, that in his reply, he should refer to the following authorities. 6 Cranch, 237; 1 Paine, 494; 4 Wash. C. C., 45; 2 Port. (Ala.), 42, 43; 7 Id., 351, 360, 432; 3 Stew. (Ala.), 76; 1 Pet., 655; Stat. Ala., 283; 13 Pet., 436, 498; 4 La., 547; 13 Id., 547; 1 Id., 56.
 
 
 89
 Jones, for defendant in error.
 
 
 90
 Both patents can stand. The parties are both pre-emptioners, and entered and paid for their land on the same day, and received certificates for it. Our patent is the elder. What does it grant? The description of the property is, the 'south-east subdivision,' &c., 'according to the official plat of the surveyor.' We must, therefore, look at the official survey, returned before the patent issued. It is the same thing as if it had actually been inserted in the body of the patent. There are two subdivisions marked upon it, and no one can doubt which is the south-eastern. It corresponds, also, with the original entry, which we find to be one hundred and ten and a half acres. The patent contains the exact technical description of the land, as claimed by us.
 
 
 91
 The argument upon the other side is, that the surveyor-general had no right to lay off the land in these two subdivisions, and that his act, being illegal, is void. But if he has done an illegal act, does that destroy our title? This section is a fractional one, containing only two hundred and three acres, forty-three more than a quarter-section. Were we bound to divide this into half or quarter-sections? Had not the Secretary of the Treasury power to adapt the mode of laying it out to the state of the country? The act of Congress was prospective, and designed to provide for just such a case as this. What is left of the section, after satisfying elder claims, is singularly shaped, and could not have been laid out into squares.
 
 
 92
 It is made an objection to the subdivision by the surveyor, that the dividing line was never run and marked upon the ground. But if this be sound, it will impeach every title made under that survey. The irregularity of the figure is no objection to the subdivision, for the act of 1820 provides for the case. It directs whole sections to be laid off by north and south lines, but fractional sections are left to the judgment of the Secretary of the Treasury. The act of 1830 introduces no new system for the benefit of pre-emptioners, but refers to the system which was then in existence. Under it, if an entire quarter-section had been laid out, there would have been only forty acres left, and if several claimants had been living on it, it would have been impossible to divide the land amongst them all.
 
 
 93
 Sherman, in reply, laid down the following propositions:
 
 
 94
 1. That Etheridge's patent, legally construed, will hold the whole 'south-west quarter' of fractional section number 22, according to his claim, allowance, and right, under the pre-emption law.
 
 
 95
 2. That Stone's patent for the 'south-east subdivision' of said section, legally construed, will hold only the south-east legal subdivision of the same; and that the south-east fractional quarter is such south-east 'legal subdivision,' according to his claim and right under the pre-emption law.
 
 
 96
 3. That if the patents cannot be legally so construed as to avoid conflict, yet that Etheridge's preliminary title, and rights under the pre-emption law, are sufficient to authorize the plaintiffs to recover; and that under the statutes of Alabama, the certificate issued to Etheridge, which is older than the certificate or patent to Stone, is sufficient to authorize the plaintiffs to recover.
 
 
 97
 These lands were surveyed in 1820, and the corners marked. It is stated in the record that they found the south-west corner and the half-mile posts all marked. Etheridge's patent includes the whole of the south-west quarter, and the granting clause is not restrained by a reference to the number of acres, which is merely descriptive. See the authorities already cited, and also, 5 Mason, 410; 1 Pet., C. C., 496; 6 Cow. (N. Y.), 706.
 
 
 98
 The pre-emption act of 1830 says that persons must take some legal subdivision. The direction is positive on this subject. The south-west quarter was such a subdivision, and created in 1820, when the lines were run. There were three corners established then, and any one could run the fourth line: and the fact of the case is, that these section lines are the only ones which were ever run. The system was adopted in 1805. Under it, quarter-sections could be found without being run out, because half-mile posts were put down. The law, then, created this quarter-section, which was established as soon as the posts were planted. Etheridge lived in sight of a post. The lines which the surveyor makes upon paper are not boundaries, but are merely indicative of subdivisions which the law has created. 5 How. (Miss.), 751.
 
 
 99
 A quarter-section is a definite, precise, legal thing. 2 Laws and Instructions, 180, 181, 183, 184, 187; 4 Stew. & P. (Ala.), 396; 7 Port. (Ala.), 432.
 
 
 100
 Etheridge's patent is not for the lot A, which runs into the north-west quarter-section.
 
 
 101
 The act of 1805 speaks of corners and lines not run out; and the second section of the act of 1796 (Land Laws, 51,) shows what the surveyor-general must return, by directing that his plat must be made up from field books. 2 Port. (Ala.), 40; 3 Stew. (Ala.), 76; 7 Port. (Ala.), 432, 434, 435; 3 Stew. (Ala.), 396. These two certificates being issued by the same officer, on the same day, must be interpreted so as to avoid a conflict between them. Lot A cannot be held under Etheridge's patent, because it runs out of the south-west quarter. Stone's is described to be the south-east subdivision; but what is that, and how can it be found, as no lines were ever run upon the ground? 2 Land Laws, 303, 820, 787, 999, 826, 827.
 
 
 102
 In instructions from the commissioner, dated January 20, 1826, a fractional section is defined to be 'a tract of land not bounded by sectional lines on all sides, in consequence of the intervention of a navigable stream, or some other boundary recognized by law, and containing a less quantity than six hundred and forty acres;' and the surveyor is directed, in 'subdividing fractional sections, containing one hundred and sixty acres and upwards,' to 'designate as many full half-quarter-sections as practicable, and the residuary lot will then be a fraction of the fractional quarter-section of which it forms a part. 2 Land Laws, 853, 854, 921, 933, 934, 136.
 
 
 103
 Mr. Justice McKINLEY delivered the opinion of the court.
 
 
 104
 This case comes before this court on a writ of error to the Supreme Court of the state of Alabama.
 
 
 105
 The plaintiffs brought an action of ejectment against the defendants, in the Circuit Court for the county of Mobile, in said state; and upon the trial, they read in evidence the following claim and entry: 'To the register and receiver of the Land-office at St. Stephens: You will please take notice, that I, James Etheridge, of Mobile county, Alabama, claim the right of pre-emption, under the act of Congress, of the 29th of May, 1830, to the south-west quarter-section 22, township 4, range 1 west;' and that on the 28th day of January, 1831, the said James Etheridge made the necessary proof that he had planted and cultivated said quarter-section in the year 1829, and remained in possession until after the 29th day of May, 1830. The plaintiff also read in evidence a patent from the United States, bearing date the 30th day of May, 1833, reciting that, 'Whereas James Etheridge, of Mobile county, Alabama, has deposited in the General Land-office of the United States, a certificate of the register of the Land-office at St. Stephens, whereby it appears that payment has been made by the said James Etheridge, according to the provisions of the act of Congress of the 24th of April, 1820, entitled 'An act making further provision for the sale of the public lands,' for the south-west quarter of section 22, in township 4, south of range 1 west, in the district of lands subject to sale at St. Stephens, Alabama, containing ninety-two acres and sixty-seven hundredths of an acre, according to the official plat of the survey of the said lands, returned to the General Land-office, by the surveyor-general, which said tract has been purchased by the said James Etheridge:
 
 
 106
 'Now know ye, that the United States of America, in consideration of the premises, and in conformity with the several acts of Congress, in such case made and provided, have given and granted, and by these presents do give and grant, unto the said James Etheridge, and to his heirs, the said tract, above described,' &c.
 
 
 107
 In obedience to an order of the Circuit Court, the surveyor of Mobile county went upon the land in controversy, and made an actual survey, and returned a plat thereof into court, showing that the section 22 was covered by private land claims, except the whole of the south-west quarter, on which James Etheridge had made his entry; and a small fraction in the south-east quarter, entered, under the preemption law, by William D. Stone; and a fraction in the north-east and north-west quarters of said section; which plat was given in evidence to the jury. And the plaintiffs proved, by the surveyor, that he found the south-west corner of said fractional section as shown by the plat returned; and also found, on the section-lines of said fractional section, the half-mile posts, each post being half a mile from the south-west corner of said fractional section; that these posts bore evidence of being those put down by the surveyor of the United States, on running the section lines; that an entire south-west quarter-section exists in said fractional section, without interfering with any private land claim, leaving a residuum on the north and the east of said quarter-section.
 
 
 108
 The defendants gave in evidence to the jury the following claim and entry, made by the said William D. Stone: 'To the register and receiver of the Land-office at St. Stephens Alabama: You will please take notice, that I, William D. Stone, of Mobile county, Alabama, claim the right of preemption, under the act of Congress, of the 29th of May, 1830, to the fraction situated in the west part of the south-east quarter of section 22, in township 4, range 1 west of 13.' And on the 25th of March, 1831, he made the necessary affidavit and proof to show that he had planted and cultivated the above described tract of land, according to said act of the 29th of May, 1830. And they also gave in evidence the following patent: 'The United States of America to all to whom these presents shall come, greeting: Whereas William D. Stone, of Mobile, has deposited in the General Land-office of the United States, a certificate of the register of the Land-office at St. Stephens, whereby it appears that full payment has been made by the said William D. Stone, according to the act of Congress, of the 24th of April, 1820, entitled 'An act making further provision for the sale of the public lands,' for the south-east subdivision of fractional section 22, in township 4 south, of range 1 west, in the district of lands subject to sale at St. Stephens, Alabama, containing one hundred and ten acres and fifty-one hundredths of an acre, according to the official plat of the surveyor of said land, returned to the General Land-office by the surveyor-general; which said tract has been purchased by the said William D. Stone: Now know ye, that the United States of America, in consideration of the premises, and in conformity with the several acts of Congress in such case made and provided, have given and granted, and by these presents do give and grant, unto the said William D. Stone, and his heirs, the said tract above described,'&c. And it was admitted by the plaintiffs, that the defendants had all the rights of said Stone in the land admitted to have been in their possession, at the time of the service of the declaration; and the defendants admitted that the plaintiffs had, at the date of the demise, and time of trial, all the rights of said patentee, Etheridge, in the land described in the declaration.
 
 
 109
 And the parties 'not wishing to encumber the record, by copying from the book entitled 'General Acts of Congress respecting the sale and disposition of the public lands, with instructions issued, from time to time, by the Secretary of the Treasury, and commissioner of the General Land-office, and official opinions of the attorney-general, on questions arising under the land laws;' and which instructions in the 2d vol., part the 2d, prepared and printed by the Senate, agree that said book may be used by either party, and any thing therein contained read as illustration of the practice of the Land-office, and construction that the acts of Congress had received in that branch of the government. The same work can be referred to, by either party, in the Supreme Court, for the purpose aforesaid. The parties further agree that the exhibit, No. 2, being the official plat of the survey of the township described in the patents of both plaintiffs and defendants, between pages 134 and 135, shall be referred to as if the same was incorporated with, and formed a part of the record in this cause.' This statement furnishes all the evidence deemed necessary and pertinent to the investigation of the questions involved in the principal instruction of the Circuit Court, to the jury, on the trial of the cause; which instruction is as follows: 'The court further instructed the jury, that, if said fractional section, No. 22, was capable of being subdivided into an entire south-west quarter-section, and two half-quarter-sections, leaving a residuum, as shown by said map and evidence of the county surveyor, still the surveyor-general was not required, under the acts of Congress, providing for the subdivisions of the public lands, and the instructions of the Secretary of the Treasury, made under the act of the 24th of April, 1820, entitled 'An act, making further provision for the sale of the public lands,' to make in his subdivision of the same, either such quarter-section, or half-quarter-sections; but might lawfully subdivide the same into two lots, A and B, as indicated by said plat of 1832; and that under said evidence, Etheridge's title would not hold the whole south-west quarter of said fractional section, but only lot A; and that Stone's title would hold lot B, being the balance of said fractional section.' To this instruction the plaintiffs excepted.
 
 
 110
 Upon the construction here given to the act of Congress, and to the instructions of the Secretary of the Treasury thereon, referred to in the above instruction of the court, depends the whole controversy between the parties to this suit. The 1st section of the act of Congress, above referred to, is in these words: 'That from and after the first day of July next, all the public lands of the United States, the sale of which is, or may be, authorized by law, shall, then offered at public sale to the highest bidder, be offered in half-quarter-sections; and when offered at private sale, may be purchased, at the option of the purchaser, either in entire sections, half sections, quarter-sections, or half-quarter-sections; and in every case of the division of a quarter-section, the line for the division thereof shall run north and south, and the corners and contents of half-quarter-sections, which may hereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the second section of an act, entitled 'An act concerning the mode of surveying the public lands of the United States, passed the 11th day of February, 1805, and fractional sections, containing one hundred and sixty acres, or upwards, shall, in like manner, as nearly as practicable, be subdivided into half-quarter-sections, under such rules and regulations as may be prescribed by the Secretary of the Treasury.' 3 Story Laws, 1774.
 
 
 111
 The settled policy of Congress has been to survey the public lands in square figures, running the lines north and south, and east and west, and to extend the subdivisions authorized by law, as far as practicable, in square figures, to the lowest denomination.
 
 
 112
 The second section of the act of the 18th of May, 1796, chap. 29, directs that the public lands 'shall be divided by north and south lines, run according to the true meridian, and by others crossing them at right angles, so as to form townships six miles square, unless where the line of the late Indian purchase, or of tracts of land heretofore surveyed or patented, or the course of havigable rivers may render it impracticable, and then this rule shall not be departed from further than such particular circumstances may require.' After directing how townships should be divided into sections, it directs that 'fractional townships shall be divided into sections in manner aforesaid, and the fractions of sections shall be annexed to, and sold with, the adjacent entire sections.' I Story Laws, 422. The lowest denomination authorized by this act, was sections; but the direction to the surveyor was to divide the fractional townships into as many sections as the particular circumstances would permit. And so by the 1st section of the act of the 24th of April, 1820, the surveyor is directed to subdivide fractional sections, containing one hundred and sixty acres and upwards, into as many half-quarter-sections as practicable, by running the lines north and south. And this statute conferred no power on the Secretary of the Treasury to make any regulation, by which a fractional section might be divided into any quarter, or other subdivision than half-quarter-sections. The only authority he acquired by the statute, was to make such rules and regulations as would enable the surveyor to make the greatest number of half-quarter-sections out of a fractional section, by running the lines north and south, or east and west; and this power he executed, by his circular letter, to the surveyors-general, of the 10th of June, 1820, 2d part, Public Land Laws, &c., 820.
 
 
 113
 Had the surveyor-general subdivided the fractional section 22, now in controversy, according to law, there would have been two half-quarter-sections in the south-west quarter, making that quarter complete, a fractional section in the south-east quarter, and a fractional section in the north-east and north-west quarters, making four tracts or subdivisions instead of two, as returned by him to the Land-office of the district. None of the lines, subdividing sections, are required by law to be made by actual survey, and marked on the land; but they are to be delineated on the township plats, according to the 2d section of the act of the 11th of May 1805, chap. 74, referred to in the act of the 24th of April, 1820, (2 Story Laws, 961.) When the township and section lines are run, and the corners marked according to law, the quarter-section lines are ascertained on the plat by protracting lines across the section north and south, and east and west, equi-distant from the section lines; and so of other subdivisions. And a surveyor going on the land to ascertain the boundary of a quarter, or half-quarter section, would do it with as much ease and certainty as if it had been delineated on the plat by the surveyor-general. Extending the subdividing lines on the township plats, is not, therefore, essentially necessary to enable the register to sell the land, or to give title to the purchaser. The register is as much bound to know what is a legal subdivision of a section, or fractional section, as is the surveyor-general.
 
 
 114
 Because he is directed by law to offer the lands, when sold at public sale, in half-quarter-sections. To enable him to perform this duty, he must know what a half-quarter-section is. And before he can offer a fractional section for sale, he must see that it has been subdivided, so as to enable him to offer as much of it in half-quarter-sections as practicable. When Etheridge applied to purchase the south-west quarter of this fractional section at private sale, as he had a right to do, under the act granting pre-emption rights, the register was bound to know whether such a subdivision could be obtained according to law. A bare inspection of the township plat must have satisfied him, in this case, that it was practicable to obtain an entire quarter-section in the south-west corner of the fractional section 22. The 1st section of the act of the 24th of April, 1820, directed that this fractional section should be divided into as many half-quarter-sections as practicable, by lines north and south; and the instructions given by the Secretary of the Treasury, under this act, directed that it should be divided into half-quarter-sections, by north and south, or east and west lines, so as to preserve the most compact and convenient forms.
 
 
 115
 There is nothing in any of the acts of Congress, nor in the instructions of the Secretary of the Treasury, to authorized the division of this fractional section made by the surveyor-general, and it being a violation of the law, and contrary to the duties of his office, it must be regarded as a void act. Miller and others v. Kerr and others, 7 Wheat., 1. So far as Stone's claim was concerned, this division of the fractional section has been treated by the register and the commissioner of the General Land-office as a legal subdivision, and the register seems to have disregarded entirely the act granting pre-emption rights, and Stone's claims and proofs under it, and to have transferred his claim to the western lot of the fractional section as divided by the surveyor-general. The certificate of the register, recited in the patent of Etheridge, takes no notice of this subdivision of the fractional section, but states that Etheridge had 'purchased of the register the lot or south-west quarter of section, number 22,' &c. The patent is for the whole of the south-west quarter of section 22, by its proper designation, and if no quantity of land had been expressed in it, all the land contained in the quarter-section would have passed by the patent to Etheridge; because, by the 2d section of the act of the 11th of February, 1805, before referred to, it is provided that 'half-sections and quarter-sections, the contents of which have not been returned, shall be held and considered as containing the one-half, or the one-fourth respectively, of the contents of the section of which they make part.' The surveyor failed to return the contents of the quarter-section in this case; it was liable, therefore, to be sold by the above rule. But it has been insisted that Etheridge, and those claiming under him, were bound, and concluded by the number of acres expressed in the patent. It is evident the quarter-section was not referred to for the number of acres contained in it; but by express words reference was made to the plat returned by the surveyor-general, showing the division of the fractional section into two parts, one of which contains the number of acres expressed in Etheridge's patent, and the other the number of acres expressed in Stone's patent. It has been already shown that this plat was illegal, and the subdivision of the fractional section void; and any reference, therefore, to this plat, to show the number of acres granted to Etheridge, is illegal and inconsistent with every previous step taken towards perfecting his title, and utterly repugnant to the previous words of grant used in the patent.
 
 
 116
 Thus it appears, that neither the claim of Etheridge, filed with the register, the certificate of purchase issued by him, nor the patent issued to Etheridge by the commissioner of the General Land-office, is founded on the division of the fractional section made by the surveyor-general; but the whole appears to be founded on the subdivision of the fractional section into one quarter-section, and two fractional sections, made by actual survey on the land. It is true that, in undertaking to state the quantity of land contained in the quarter-section, reference is made to what is there called the official plat of the lands returned to the General Land-office by the surveyor-general; which is nothing more than a reference to this same subdivision of the fractional section so often mentioned. But this question necessarily arises: How can the contents of either division of the fractional section, thus divided into two lots or subdivisions, show the contents or number of acres in the south-west quarter of the same section? The ninety-two acres and sixty-seven hundredths of an acre mentioned in the patent, is the number of acres contained in the western subdivision of said fractional soction, and consists of part of the south-west, and part of the north-west quarters of the fractional section, as appears by the plat used on the trial. No part of the north-west quarter of this fractional section can by any reasonable construction be considered as being within and part of the land included in a patent for the south-west quarter of the section. This proves that the reference to this plat, in Etheridge's patent, is both delusive and illegal, and must, therefore, be rejected as void and inoperative.
 
 
 117
 The act of the 29th of May, 1830, to grant pre-emption rights to settlers on the public lands, chap. 209, appropriated this quarter-section of land, on which Etheridge was then settled, to his claim, under the act, for one year, subject, however, to be defeated by his failure to comply with its provisions. During that time, this quarter-section was not liable to any other claim, or to be sold to any other person, except at public sale, under the proclamation of the President of the United States; and that Etheridge had a right to prevent, by paying for it as directed by the act. And as he has complied with all the requisitions of the act, as far as the mistakes and illegal acts of the ministerial officers of the government would permit, he has acquired a good title by his patent, against the United States, for the whole of said south-west quarter-section. The remaining question is, whether Etheridge's title is good against Stone's patent? Stone claimed 'the right of pre-emption, under the act of Congress of the 29th of May, 1830, to the fraction situated in the west part of the south-east quarter of section 22, in township 4, range 1 west.' This claim confined his pre-emption right to that specific fraction. And although the act gave to every settler on the public lands the right of pre-emption of one hundred and sixty acres, yet if a settler happened to be seated on a fractional section, containing less than that quantity, there is no provision in the act by which he could make up the deficiency, out of the adjacent lands, or any other lands.[2] The only case provided for in the act, by which the pre-emptioner had the right to enter land outside of the quarter, or fractional section, on which he was settled at the passage of the act, is the case provided for in the 2d section. When two or more persons were settled on the same quarter-section, it might be divided between the two first settlers, and each be entitled to a pre-emption of eighty acres of land elsewhere, in the same land-district. But, in this case, Stone was not only permitted to take land, outside of the fractional section on which he was settled, but he was permitted to take land on which Etheridge was settled, and to which he had previously proved his right under the same act of Congress.
 
 
 118
 In the case of Lindsay and others v. Miller and others, 6 Pet., 674, the plaintiffs in ejectment claimed title under a patent, dated the 1st of December, 1824, founded on an entry and survey made in the same year. The defendants claimed title under an entry, made in January, 1783, upon a military warrant, for services rendered in the Virginia state-line, and a survey made thereon, in the same month, and recorded on the 7th of April, of the same year, and a patent issued by the state of Virginia, in March, 1789. This land lay in what is called the military district, between the rivers Scioto and Little Miama, in the state of Ohio. This district had been reserved, in the deed of cession, dated the 1st of March, 1784, made by Virginia to the United States, to satisfy the claims of the Virginia troops on continental establishment, in the event of there not being sufficient good land for that purpose, in a reservation previously made by Virginia, on the southeast side of the Ohio river. Although the defendants proved possession, under this title, for upwards of thirty years, the entry, survey, and patent, were adjudged by the court to be void, on the ground that the land had been reserved for the satisfaction of military warrants, granted for services of the Virginia troops on continental establishment, and was not, therefore, subject to entry upon warrants for services rendered in the Virginia state-line.
 
 
 119
 In the ease before the court, all the land in the south-west quarter of the fractional section had been appropriated, by law, to satisfy Etheridge's claim, and no other land could be substituted in lieu of that quarter-section, for any part of it. Stone's claim arose under the same law, and by the same provisions was confined to the fraction in the west part of the south-east quarter of the same section, and gave no right to land elsewhere. So much of the patent to Stone as purports to grant land within the south-west quarter of the section, is, therefore, not only an appropriation of land to his claim, not subject to it according to the act, but which, by the same act, had been appropriated to another claim, arising under the same act, concurrent with and equal in all respects to Stone's claim. How, then, could his patent give him title to land that was not subject to his claim; land that he never had legally claimed; and to land that, by law, had been appropriated to and claimed by another? It seems to us, this case is clearly within the principles settled in the case above referred to, and that the patent granted to Stone is void, for so much of the land included in it as lies within the said southwest quarter of the fractional section, and for which Etheridge holds a patent.
 
 
 120
 It has been insisted, however, that as Etheridge only paid for the quantity of land mentioned in his patent, that he can have no right to land paid for by Stone, and included in his patent. This is one of the results of the mistaken and illegal acts of the ministerial officers of the government, which, as already shown, can neither benefit one party, nor prejudice the rights of the other. The United States have received full payment for all the land contained in both patents. And if Stone has paid for land which belonged to Etheridge, that is a matter to be adjusted between themselves, amicably, or by law, as they may choose.
 
 
 121
 Upon a full view of the whole case, it is the opinion of the court, that the judgment of the Supreme Court of Alabama be reversed.
 
 
 122
 Mr. Justice CATRON.
 
 
 123
 I feel myself bound to dissent, from the foregoing opinion for the following reasons:
 
 
 124
 1. By the act of 29th May, 1830, a pre-emption right settler then in possession was entitled to enter with the register of the Land-office in the district where the land lay, by legal subdivisions, not more than one hundred and sixty acres.
 
 
 125
 The controversy before us turns, partly, on what was the true 'legal subdivision' of fractional section 22, containing two hundred and three acres: This must be ascertained from the laws on the subject existing in 1830. The lines of public surveys actually run and marked in the field, are township extensions, and section boundaries; the lines dividing sections into quarters, half-quarters, (and quarter-quarters since 1832,) being only indicated, or depicted upon the township plats returned and recorded in the office of the register.
 
 
 126
 The act of 26th March, 1804, provides for the first time for the sale of the public lands in quarter-sections; and also directs (sect. 9) that fractional sections shall be sold entire; or by uniting two or more together. The act of February 11th, 1805, directs with absolute precision, leaving no discretion on the subject, the manner in which full sections shall be divided into quarters: but makes no provision for the subdivision of fractional sections. It was not until the passing of the act of April 24, 1820, that these were authorized to be subdivided; and then only when they contained more than one hundred and sixty acres. The act of 1820, in directing the manner in which full sections shall be subdivided into half-quarters, or eighty acre lots, is as absolutely precise in its provisions as that of 1805; and, as in the former case, gives no discretionary power so far as these subdivisions are concerned—but in authorizing the subdivision of fractional sections containing one hundred and sixty acres and upwards, it directs that they shall in like manner, 'as nearly as practicable,' be subdivided into half-quarter sections, or eighty acre lots—'under such rules and regulations, as may be prescribed by the Secretary of the Treasury.' Under the discretionary power here given, rules and regulations were prescribed by Secretary Crawford, on the 10th of June, 1820, (2 Land Laws and Opinions, p. 820, No. 796.) A circular was addressed to the surveyors-general of that date, for their government in this respect, by the commissioner of the General Land-office: It orders that fractional sections, containing more than one hundred and sixty acres, shall be divided into half-quarter sections, by north and south, or east and west lines, so as to preserve the most compact and convenient forms. 'You will, therefore,' says the commissioner, 'be pleased to divide the fractional sections in your district, (which remain unsold,) in the manner above directed, and report to this office, and to the registers of the land-district in which those fractions respectively are situate, the subdivisions, together with the quantity in each. It is not intended to run the subdivisional lines, and mark them, but merely to make them upon your surveys, and calculate the quantity of land in each subdivision.'
 
 
 127
 In January, 1826, (2 Land Laws, p. 583, No. 841,) further instructions were given on this subject, to the surveyor-general at Washington, Mississippi. The commissioner says, among other things—'A fractional section is a tract of land not bounded by sectional lines on all sides, in consequence of the intervention of rivers, &c., and containing a less quantity than six hundred and forty acres.'
 
 
 128
 Speaking of the regulations, and the circular letter founded on them, the commissioner continues: 'The substance of the rule is, that fractional sections of one hundred and sixty acres and upwards are to be subdivided by east and west, or north and south lines, at the discretion of the surveyor, so as to preserve the most compact and convenient forms. Each lot to be, as nearly as practicable, a half-quarter-section, containing a quantity of eighty acres; sometimes rather more, sometimes less, as the locality demands.'
 
 
 129
 According to these instructions, fraction No. 22 was divided: two precise eighty-acre tracts could not be made out of it; half-quarters, or eighty acres, was the least quantity that could be sold by the act of 1820, if in regular form and part of a full section; but if in irregular form, and the fraction of a section, containing upwards of one hundred and sixty acres, then it was left to the Secretary to cause it to be subdivided according to his own regulations, into two or more tracts, approaching, 'as nearly as practicable,' to eighty acres each. He directed the subdivisions to be made in all cases so as to preserve the most compact and saleable forms, accommodating the tracts to the sides of rivers, or other legal intervening boundaries to subserve the best interests of the government. This practice has prevailed as the governing rule for nearly a quarter of a century, and is now in full operation—large quantities of land have been sold thus subdivided; and great quantities yet remain to be sold. I speak on information derived from the commissioner of the General Land-office. The idea of taking out of a fraction a quarter-section of one hundred and sixty acres, if found there, as if the section was entire, and leaving surrounding strips of a few acres each, unsaleable and of little or no value, as will be the case here, never has been entertained at that office, as the true construction of the act of 1820, from the date of Mr. Crawford's instructions, (June 10th, 1820,) up to this time. On mature consideration, I think the instructions given legitimately within the authority conferred on the Secretary. In this view of the law, as applicable to the present case, I am supported by the opinion of the attorney-general, given on Etheridge's claim in 1837, (2 Land Laws and Opinions, p. 136, No. 85.)
 
 
 130
 2. Suppose, however, it was doubtful whether they were or not authorized, is it admissible for the courts of justice, after such a lapse of time, to call in question the construction given to the act; to disturb so many titles taken under it—and to break up existing subdivisions? The sole authority to which the act referred for its exposition, and the prescribing of rules and regulations to carry it into execution, was the Secretary of the Treasury. His jurisdiction was subject to no supervision; he was constituted the only judge, from whose decision there was no appeal on part of purchasers; they were compelled to buy in the form, and quantity, the lands were offered for sale, or not be permitted to purchase at all. The Secretary having adjudged and settled the construction of the act according to his views of its true meaning, and this coeval with its passage—a strong circumstance: the government in its executive and political departments, and the community at large concerned in purchasing from the government, having acquiesced without complaint, recognizing the construction as the true one, through so great a lapse of years, it is now supposed by me, the duty of this court, on the question being presented here, and that for the first time, to acquiesce also. That these subdivisions are for the best interests of the United States is manifest; all others have abided by them, and so should the plaintiff.
 
 
 131
 If one of our own judgments made in 1820, coeval with the statute, had produced similar consequences; if many thousands, of titles rested on it, (as there surely do on Mr. Crawford's instructions,) I should feel myself wholly unauthorized, at this day, to overthrow the decision, however doubtful I might think it to be. The conservative rule of communis error facit jus, is universal in courts of justice, in regard to their own judgments, under such circumstances; and undoubted judicial propriety requires its adoption, as it seems to me, when dealing with the decision of the Secretary in the present instance. This course is peculiarly due to the repose of titles, and the stable maintenance of an established system in a great department; a system that cannot be changed in this respect without much expense, confusion, and delay, in the administration of that department.
 
 
 132
 3. But suppose the Secretary was mistaken, and the subdivision of fractional section 22 is illegal; what then is the plaintiff's case? His title is a patent; on his legal title he must recover, therefore he cannot be heard to say his patent is void because founded on an illegal subdivision: the question then is reduced to this; what does the patent cover? Etheridge had no peculiar rights by the act of 1830, save that he had a preference of entry; like others purchasing of the United States he was compelled to buy in legal subdivisions; before 1820 not less than an entire fractional section could be sold; nor after the act of that year, could one be sold in subdivisions until divided, under regulations by the Secretary of the Treasury. Further than this, the act of 1805 remained unchanged, as to fractions. Etheridge could not be permitted to treat a quarter-section in a fraction, although found there, as if it was found in an entire section. He did attempt it, in proving up his preference right, but when he applied to enter at the Land-office the register rejected his claim, and compelled him to take the land on which he resided in the form and quantity it had been laid off according to the instructions; and this he did take. The government is bound by its patent; is estopped to disavow the subdivision granted; and as estoppels are mutual, Etheridge is equally bound, by the grant. It recites the patent certificate; this says it is for ninety-two acres and sixty-seven hundredths, bounded 'according to the official plat of the survey of the said lands, returned to the General Land-office by the surveyor-general—which said tract, described in the plat returned, has been purchased by the said James Etheridge.' The plat is part of the patent certificate; is referred to in the patent, and is part of that also, just as much as if it was attached to the same paper. By the plats of public surveys, lands must be identified, and the boundaries ascertained, in all cases of the kind. The parties agree of record that exhibit No. 2 is the official map described in the patent of Etheridge; according to this, he purchased lot A for ninety-two acres and sixty-seven hundredths; his eastern boundary being the red line made by the surveyor-general, pursuant to the instructions. This was undoubtedly the land the government intended to sell, and, as I think, as certainly the same Etheridge intended to buy, and did buy; of course he can recover no land east of that line, and therefore the judgment ought to be affirmed, even if the instructions were illegal and void.
 
 
 133
 4. The case does not stop here: Stone's patent is elder than Etheridge's; the same plat is referred to in each; Stone's is for the one hundred and ten acres and fifty hundredths east of the red line. This is not disputed. To overcome it, Etheridge's patent must be supported by a legal entry for the same land, elder than Stone's patent. As already stated, until Etheridge paid his money, he could have no legal entry from which to date his title. There being no such subdivision existing in law as the south-west quarter of fractional section 22, when Etheridge presented his occupant claim, he could not be permitted to enter in that form, or for that quantity. Such was the express instruction of May 31, 1831, (2 Land Laws and Instructions, No. 497, and again in No. 521.) The first subdivision was created afterwards by the act of the surveyor-general, and is indicated by the red line. That it is denominated the south-west quarter in the patent, amounts, in my judgment, to very little; thus the department saw proper to call such subdivisions; the denomination was arbitrary and not precise, but we cannot discard the substance for the sake of correcting terms of description open to verbal criticism. The land contained in plat referred to in Etheridge's patent, is a technical quarter-section in the language of the General Land-office; and such subdivisions are known by no other name there, as will be seen by No. 483 and No. 486 in the volume of Instructions above referred to. Thus in No. 483, dated July 28th, 1830, the commissioner instructs the register at Mount Salus, that the pre-emption law of that year restricted the quantity to be located to one hundred and sixty acres, or a quarter-section; but that it did not intend that an excess over one hundred and sixty acres, 'in a tract of land technically known as a quarter-section,' should be cut off so as to restrict the quantity literally to one hundred and sixty acres. 'The law, (says he,) having taken it for granted that every quarter-section contains one hundred and sixty acres, which not being the fact, we must be guided by what we know to be the spirit and intention of the law.' He then instructs the register, in cases of fractional sections, to conform to the subdivisions as made by the surveyor-general, and to give the quantity as near as practicable.
 
 
 134
 No. 486 is a general circular, dated September 14, 1830, on the same subject in part. Instruction 8 directs: 'Although a quarter-section may be found to contain rather more than the ordinary quantity of one hundred and sixty acres, the right of pre-emption is extended to the full quantity of such quarter-section.' In the language, therefore, of the General land-office, the south-west quarter of fractional section 22, called for in Etheridge's patent, is as well known by its designation, as if the section was entire. This the Instruction No. 497 above, explains, where the subdivided quantity is less, to be a 'technical' quarter also, as well as if the quantity had been more. But if there be uncertainty, here, as in former cases, we must refer to the plat and quantity to explain the uncertainty. This course was pursued in the case of McIver v. Walker, 9 Cranch, 173, and again in 4 Wheat., 444. There the plat was held to control the face of the patent, and fixed a different locality, because Crow Creek was laid down on the plat, nearly through its centre; the location certificate copied in the patent, as in this case, called for a beginning, and for courses from that point, running off from the creek, which was not named as being crossed by the lines; yet this court diregarded the calls, and held the land lay on both sides of the creek, as indicated in the naked plat. It was a much weaker case than the present. In patents of the United States, from their earliest date down to this day, nothing is referred to but numbers on the public surveys. To hold that the surveys did not explain and control the patent as to identity, and side lines, would be an abandonment of both; as nothing else can establish either.
 
 
 135
 Much stress is laid on the fact that the half-mile post is found on the south boundary of section 22. The same line-marks are uniformly made on all sectional lines, regardless of fractions: so it would have been done had the fraction 22 been for less than one hundred and sixty acres, and not subjected to subdivision. The section south may have been entire, and the corner post necessary for the purposes of that section.
 
 
 136
 Another difficulty stands in the way of the plaintiff's recovery. Stone's patent is the elder; it is admitted it covers the land in dispute—the patent passed the perfect and consummate title; in an action of ejectment the patent is conclusive, as was held by this court in Wilcox v. Jackson, and Bagnell v. Broderick, 13 Pet., 516, 450. You can only go behind it, and give it earlier date, from a precise legal entry for the same land made by the grantee, to overreach an elder patent; as this court held in Ross v. Barland, 1 Pet., 655. We have seen Etheridge did not enter the land in dispute when he paid his money, and took his patent certificate. To overthrow Stone's patent, we must rely on the preference right to enter. At best, it is a remote and doubtful equity; Stone paid for the land, (and if the assumption be true,) has an equity attached to it for his purchase money; presenting a case of conflicting equities, with which a court of law cannot deal. In the language of this court in Bagnell v. Broderick, 'we are bound to presume for the purposes of this action, that all previous legal steps had been taken by Stone to entitle himself to the patent, and that he had the superior right to obtain it, notwithstanding the claim set up by Etheridge; and having obtained the patent, Stone had the best title known to a court of law, to wit, the fee.' There a much more imposing equity than Etheridge can pretend to, was set up. In no respect, therefore, is there any ground for reversing the decision of the Supreme Court of Alabama, as is supposed by me.
 
 
 137
 In the case of Brown et ux. v. Hunt, Mr. Justice DANIEL dissents from the opinion of the court, and concurs in opinion with Mr. Chief Justice and Mr. Justice CATRON.
 
 
 
 [2]
 RELIED ON. Lyttle v. Arkansas, 9 How., 334.